Aileen M. Hunter, California Bar No. 253162
aileen.hunter@bclplaw.com
Traci G. Choi, California Bar No. 307245
traci.choi@bclplaw.com
**BRYAN CAVE LEIGHTON PAISNER LLP**
3161 Michelson Drive, Suite 1500
Irvine, California  92612-4414
Telephone:   (949) 223-7000
Facsimile:    (949) 223-7100

Attorneys for Plaintiff
CHARTWELL STAFFING SERVICES INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| CHARTWELL STAFFING SERVICES INC, a New York corporation,<br><br>Plaintiff,<br><br>v.<br><br>ATLANTIC SOLUTIONS GROUP INC., a Delaware corporation, doing business as EMPIRE WORKFORCE SOLUTIONS; ADAM KIDAN, an individual; TONY ALANIS, an individual; ROSA BENAVIDES, an individual; KEVIN CASE, an individual; CATHY CLARK, an individual; MARLENE CORNEJO, an individual; JAMIE DIAZ, an individual; DENISE GONZALES, an individual; PATRICIA HANKS, an individual; IVETTELIS NIEVES, an individual; NICK REBULTAN, an individual; and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR**<br><br>**(1)** Violation of 18 U.S.C. § 1836<br><br>**(2)** Violation of Cal. Civ. Code § 3426 *et seq.*<br><br>**(3)** Inducing Breach of Contract<br><br>**(4)** Intentional Interference with Contractual Relations<br><br>**(5)** Breach of Contract<br><br>**(6)** Conversion<br><br>**(7)** Breach of Fiduciary Duty<br><br>**(8)** Violation of Cal. Bus. & Prof. Code § 17200 *et seq.* |

BRYAN CAVE LEIGHTON PAISNER LLP
3161 MICHELSON DRIVE, SUITE 1500
IRVINE, CALIFORNIA 92612-4414

Plaintiff Chartwell Staffing Services Inc. ("Chartwell") complains and alleges as follows:

## **PARTIES**

1.      Plaintiff Chartwell Staffing Services Inc. is a New York corporation doing business in the County of Los Angeles, California, with its principal place of business in Lancaster, Pennsylvania.

2.      Upon information and belief, Atlantic Solutions Group Inc., doing business as Empire Workforce Solutions ("Empire"), is a Delaware corporation doing business in the County of San Bernardino, California, with its principal place of business in Ontario, California.

3.      Upon information and belief, Defendant Adam Kidan ("Kidan") is an individual residing in the County of Los Angeles, California.

4.      Upon information and belief, Defendant Tony Alanis ("Alanis") is an individual residing in the County of Orange, California.

5.      Upon information and belief, Defendant Rosa Benavides ("Benavides") is an individual residing in the County of Los Angeles, California.

6.      Upon information and belief, Kevin Case ("Case") is an individual residing in the County of Ocean, New Jersey.

7.      Upon information and belief, Cathy Clark ("Clark") is an individual residing in the County of York, Pennsylvania.

8.      Upon information and belief, Defendant Marlene Cornejo ("Cornejo") is an individual residing in the County of Los Angeles, California.

9.      Upon information and belief, Defendant Jamie Diaz ("Diaz") is an individual residing in Pennsylvania.

10.      Upon information and belief, Defendant Denise Gonzales ("Gonzales") is an individual residing in the County of Los Angeles, California.

11.      Upon information and belief, Defendant Patricia Hanks ("Hanks") is an individual residing in the County of San Bernardino, California.

BRYAN CAVE LEIGHTON PAISNER LLP
3161 MICHELSON DRIVE, SUITE 1500
IRVINE, CALIFORNIA 92612-4414

12.     Upon information and belief, Ivettelils Nieves ("Nieves") is an individual residing in the County of Lancaster, Pennsylvania

13.     Upon information and belief, Defendant Nick Rebultan ("Rebultan") is an individual residing in the County of Orange, California.

14.     Chartwell is ignorant of the true names and capacities of the defendants sued as Does 1 through 10, inclusive, and therefore sues these Doe defendants by such fictitious names. Chartwell will amend this complaint to allege their true names and capacities when ascertained. Chartwell alleges on information and belief that at all times herein defendants, and each of them, were the agents, alter egos, servants, and employees of each of the remaining defendants and acted within the scope and course of such agency or employment.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question jurisdiction).

16.     This Complaint arises out of Defendants' violation of Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836(b).

17.     This Court also has supplemental jurisdiction over Plaintiff's state law claims because they "are so related to the [federal] claims . . . that they form part of the same case or controversy . . . ." 28 U.S.C. § 1367.

18.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this district.

## FACTS COMMON TO EACH CLAIM

### Background

19.     Adam Kidan is infamously known for his involvement with Jack Abramoff on the SunCruz Casinos deal.  In 2005, Kidan pled guilty to conspiracy and fraud in connection with a fraudulent $23 million wire transfer, which he used

BRYAN CAVE LEIGHTON PAISNER LLP
3161 MICHELSON DRIVE, SUITE 1500
IRVINE, CALIFORNIA 92612-4414

to defraud investors.  Kidan and Abramoff were ordered to pay restitution of more than $21 million.  Kidan was released from prison in 2009.

20.     In 2012, Adam Kidan began working for his wife at Chartwell, a national staffing agency which provides a variety of staffing services to its customers.  Chartwell is one of the most successful woman owned staffing agencies in the country.  Kidan's wife was at all relevant times, and still is, the sole shareholder and owner of Chartwell.  At no time did Kidan have an ownership interest in Chartwell.

21.     From 2012 to March 8, 2019, Kidan was an officer of Chartwell.  He served in various officer positions during that time, including Secretary, Vice President, Chief Executive Officer, and President of Chartwell.

22.     In 2015, Chartwell hired Rosa Benavides to serve as a Branch Manager.  On February 23, 2015, Benavides entered into an Employment Agreement with Chartwell.

23.     In 2015, Chartwell hired Patricia Hanks to serve as an Area Vice President of Operations.  On December 14, 2015, Hanks entered into an Employment Agreement with Chartwell.

24.     In 2015, Chartwell hired Ivettelis Nieves to serve as an Operations Manager.  On December 15, 2015, Nieves entered into an Employment Agreement with Chartwell.

25.     In 2016, Chartwell hired Kevin Case to serve as a Senior Vice President MSP/VMS.  On January 4, 2016, Case entered into an Employment Agreement with Chartwell.  In 2017, he was promoted to Chief Growth Officer.

26.     In 2016, Chartwell hired Tony Alanis to serve as an Area Vice President of Operations.  On February 2, 2016, Alanis entered into an Employment Agreement with Chartwell.

27.     In 2016, Chartwell hired Marlene Cornejo to serve as a Staffing Specialist. On February 9, 2016, Cornejo entered into an Employment Agreement with Chartwell.  In 2017, she was promoted to Branch Manager.

28.     In 2016, Chartwell hired Cathy Clark to serve as a Business Development Manager.  On June 6, 2016, Clark entered into an Employment Agreement with Chartwell.

29.     In 2012, Chartwell hired Jamie Diaz to serve as a Vice President of Administration.  On June 2, 2017, Diaz entered into an Employment Agreement with Chartwell.

30.     In 2017, Chartwell hired Denise Gonzalez to serve as a Staffing Specialist.  In July 2017, Gonzalez entered into an Employment Agreement with Chartwell.

31.     In 2017, Chartwell hired Nicolas Rebultan to serve as a Staffing Specialist.  On October 2, 2017, Rebultan entered into an Employment Agreement with Chartwell.

32.     Benavides', Hanks', Nieves', Case's, Alanis', and Cornejo's Employment Agreements all state, in relevant part:

5.   **Confidentiality and Trade Secrets**

Employee acknowledges that the manuals, methods, forms, techniques and systems which Employer owns, plans or develops, whether for its own use or for use by or with its clients, are confidential trade secrets and are the property of Employer.

Employee further acknowledges that [he or she] will obtain access to confidential information concerning Employer's clients, including their business affairs, special needs, preferred methods of doing business, methods of operation, key contact personnel and other data, all of which provides Employer with a competitive advantage and none of which is readily available except to employees of Employer.

Employee further acknowledges that [he or she] will obtain access to the names, addresses, telephone numbers, qualifications, education, accomplishments, experience, availability, resumes and other data regarding persons who have applied or been recruited for temporary or permanent employment by Employer, as well as job order specifications and the particular characteristics and

BRYAN CAVE LEIGHTON PAISNER LLP
3161 MICHELSON DRIVE, SUITE 1500
IRVINE, CALIFORNIA 92612-4414

BRYAN CAVE LEIGHTON PAISNER LLP
3161 MICHELSON DRIVE, SUITE 1500
IRVINE, CALIFORNIA 92612-4414

requirements of persons generally hired by a client, specific job listings, mailing lists, computer runoffs, financial and other information, all of which provides Employer with a competitive advantage and none of which is readily available except to employees of Employer.

Employee agrees that all of the foregoing information regarding Employer's methods, clients and employees constitutes valuable and proprietary trade secrets and confidential information of Employer (hereinafter "Confidential Information").

6. **Non-Disclosure Agreement**

Employee agrees that except as directed by Employer, the Employee will not at any time, whether during or after [his or her] employment with the Employer, use for any reason or disclose to any person any of the Employer's Confidential Information or permit any person to examine and/or make copies of any documents which may contain or are derived from Confidential Information, whether prepared by the Employee or otherwise, without the prior written permission of Employer.

33. Hanks' Nieves', Case's, Alanis', and Cornejo's Employment Agreements further state, in relevant part:

7. **Agreement Not to Compete for Accounts or Personnel**

Employee agrees that during [his or her] employment with Employer and/or the twelve (12) months after such employment is terminated by either party, she will not: directly or indirectly, contact, solicit, divert, take away or attempt to contact, solicit, divert or take away any staff employee, temporary personnel, customer, account, business or goodwill from Employer, either for Employee's own benefit, some other person or entity, and will not aid or assist any other person or entity to engage in any such activities. Such shall cover the geographic area where the employee conducted business during his employment.

34. Clark's, Diaz's, Gonzalez's, and Rebultan's Employment Agreements state, in relevant part:

4. **Restrictive Covenants.**

(a) Confidential Information Defined. Employee acknowledges that the manuals, methods, forms, techniques, and systems which the Company owns, plans or develops, whether for its own use or for use by or with its clients, are confidential trade secrets and are the property of the Company. Employee further acknowledges that s/he will obtain access to confidential information concerning the Company and its clients, including their business affairs, special needs, preferred methods of doing business, methods of operation, key contact personnel and other data, all of which provides

the Company with a competitive advantage and none of which is readily available except to employees of the Company.  Employee further acknowledges that s/he will obtain access to the names, addresses, telephone numbers, qualifications, education, accomplishments, experience, availability, resumes and other data regarding persons who have applied or been recruited for temporary or permanent employment by the Company, as well as job order specifications and the particular characteristics and requirements of persons generally hired by a client, specific job listings, mailing lists, computer runoffs, financial and other information, all of which provides the Company with a competitive advantage and none of which is readily available except to employees of the Company.  Employee agrees that all of the foregoing information regarding the Company's methods, clients and employees constitutes valuable and proprietary trade secrets and confidential information of the Company and/or its clients and employees (hereinafter "Confidential Information").

(b) <u>Non-Disclosure of Confidential Information</u>.  Employee agrees that except as directed by the Company, s/he will not at any time, whether during or after his/her employment with the Company, use for any reason or disclose to any person, any Confidential Information, or permit any person to examine and/or make copies of any documents or electronic files which may contain or are derived from Confidential Information, whether prepared by the Employee or otherwise, without the prior written permission of the Company.

(c) <u>Non-Solicitation of Employees and Independent Contractors</u>.  Employee acknowledges that important factors in Company's business and operations are the loyalty and goodwill of its staff employees, associate employees, and independent contractors.  Accordingly, Employee agrees that during the term of this Agreement and for a period of twelve (12) months following the termination of the Agreement (the "Non-Solicitation Period"), s/he will not disrupt or interfere with the business of the Company by actively soliciting, recruiting, or raiding any staff employee or temporary associate or otherwise inducing the termination of employment of any employee of the Company either for Employee's own benefit or the benefit of some other person or entity, and will not aid or assist any other person or entity to engage in any such activities.  Employee also agrees and covenants not to use the Company's Confidential Information to directly or indirectly solicit employees of the Company. . . .

35.     Clark's, and Diaz's Employment Agreement further states, in relevant part:

BRYAN CAVE LEIGHTON PAISNER LLP
3161 MICHELSON DRIVE, SUITE 1500
IRVINE, CALIFORNIA 92612-4414

(d) <u>Agreement Not to Compete for Accounts or Personnel</u>. Employee shall not prepare for, undertake, or discuss with other employees of the Company any business or professional employment of any kind which is competitive with the Company. Employee also agrees that during the term of this Agreement and twelve (12) months following its termination by either Party (the "Non-Compete Period"), he/she will not . . . directly or indirectly, contact, solicit, divert, take away or attempt to contact, solicit, divert or take away any staff employee, temporary personnel, customer, account, business or goodwill from the Company, either for the Employee's own benefit or some other person or entity, and will not aid or assist any other person or entity to engage in any such activities. Such shall cover the geographic area where the employee conducted business during his/her employment. . . .

36.    Each of the Employment Agreements further contains an attorneys' fees provision. Benavides', Hanks' Nieves', Case's, Alanis', and Cornejo's Employment Agreements state:

10. **Legal Fees.** In the event of any dispute arising out of the subject matter of this Agreement, the prevailing party shall recover, in addition to any other damages assessed, its attorneys' fees and court costs incurred in litigating or otherwise settling or resolving such dispute, whether or not an action is brought or prosecuted to judgment.

37.    Clark's, Diaz's, Gonzalez's, and Rebultan's Employment Agreements state:

6. **Attorney's Fees.** In the event of any dispute arising out of the subject matter of this Agreement, the prevailing party shall recover, in addition to the damages assessed, its/her attorneys' fees, arbitrator's fees, and court costs incurred in litigating, arbitrating, or otherwise settling or resolving such dispute, whether or not an action is brought or prosecuted to judgment. If any legal or equitable action, including an action for declaratory relief, is brought to enforce or interpret the provisions of this Agreement, the prevailing Party shall be entitled to reasonable attorneys' fees and costs, in addition to any other relief to which that Party may be entitled.

## **Kidan's Embezzlement and Fraud.**

38.    Although Kidan served in various officer positions during his tenure with Chartwell, he abused his position by defrauding Chartwell and embezzling funds for his own personal use.

BRYAN CAVE LEIGHTON PAISNER LLP
3161 MICHELSON DRIVE, SUITE 1500
IRVINE, CALIFORNIA 92612-4414

39.     In 2017, Kidan withdrew approximately $12,000 in increments of $100 to $500 from Chartwell's debit account for personal use.  He never repaid the amounts he took from Chartwell's account.

40.     In 2017, Kidan also received a pay advance of $30,000.00.  Kidan was to repay $500 every week until the advance was repaid.  Kidan stopped making payments, and still owes Chartwell a balance of $16,000.00.

41.     From at least 2015 to March 8, 2019, Kidan routinely used Chartwell credit cards and funds to pay for his personal expenses.  Specifically, in 2018, Kidan expensed approximately $76,764.71 of his personal expenses, including Porsche lease payments of $2,258.76 per month and purchases from Tiffany & Co and Jimmy Choo, along with countless cash withdrawals.  Despite Chartwell's demands, Kidan has failed to repay the amounts owed.

42.     Further, from January 2017 to January 2018, Kidan placed Elizabeth Harris on Chartwell's payroll.  Upon information and belief, Ms. Harris had a romantic relationship with Kidan.

43.     Ms. Harris has never worked for Chartwell.  Chartwell paid Ms. Harris approximately $95,230.20 in gross wages from January 2017 to January 2018.

44.     In March 2019, Chartwell discovered that Kidan had borrowed money from various entities offering cash advances, claiming, among other things, that he had an ownership interest in Chartwell to induce those entities to lend money to Chartwell.  Kidan took these cash advances, with extremely high interest rates, and used the proceeds for his own personal expenses.

45.     Specifically, Kidan represented to Straight Line Source, a loan broker, that he was the "Owner" of Chartwell, to obtain a merchant cash advance to receive an advance of $404,630, to be paid back in the amount of $578,620.90.

46.     Kidan further represented to TVT Capital that he had an ownership interest in Chartwell, presenting a fraudulent certificate for 200 shares of Chartwell, to obtain a cash advance.

BRYAN CAVE LEIGHTON PAISNER LLP
3161 MICHELSON DRIVE, SUITE 1500
IRVINE, CALIFORNIA 92612-4414

47.     Chartwell was forced to repay a sum of $578,620.90 as a result of the cash advances Kidan obtained under the auspices of acting as an officer of Chartwell.

### Empire Workforce Solutions.

48.     On or about November 7, 2018, while still acting as the President of Chartwell, Kidan incorporated Empire in the state of Delaware.  Kidan is the Chief Executive Officer and Chief Financial Officer of Empire.

49.     Beginning in January 2018, to March 2019, Kidan actively solicited employees of Chartwell to leave Chartwell with Kidan, and work for Empire.

50.     Specifically, Kidan met with and spoke to employees, while still working as an officer for Chartwell, and attempted to induce them to join his new company.  Adam held at least two meetings at hotels where he asked employees to meet him and then tried to solicit them to work for Empire:  one at the Shade Hotel in Manhattan Beach on or about February 15, 2019, and one at the Viceroy in Santa Monica on or about February 16, 2019.

51.     On or about March 5, 2019, Empire registered with the California Secretary of State to do business in California.

52.     On March 6, 2019, at approximately 8:00 p.m., while on paid time off, Diaz logged into Chartwell's database containing Chartwell's list of customers and list of temporary employees Chartwell placed with customers.  Upon information and belief, Diaz downloaded the information from Chartwell's database and saved it on her personal device.  Upon information and belief, Diaz improperly transmitted the information from the database, without Chartwell's knowledge or consent.  Diaz resigned from Chartwell two days later, and began working for Empire.

53.     On March 8, 2019, Kidan resigned as President of Chartwell.  As a result of Kidan's solicitation efforts, six employees - Diaz, Alanis, Benavides, Cornejo, Gonzales, Hanks - terminated their employment with Chartwell on March 8, 2019.

54.     Upon information and belief, Diaz acted in concert with and at the direction of Empire, Kidan, Alanis, Benavides, Hanks, Cornejo, and Gonzales in improperly accessing and transmitting trade secret information belonging to Chartwell.

55.     Upon information and belief, Diaz, Alanis, Benavides, Hanks, Cornejo, and Gonzales each immediately began working for Empire.

56.     Kidan, Diaz, Alanis, Benavides, Hanks, Cornejo, and Gonzales, on behalf of Empire, all conspired to solicit other employees from Chartwell.

57.     As a direct result of their efforts, on March 15, 2019, Claudia Garcia, Mayra Nava, Yadira Rodriguez, and Nick Rebultan resigned from their positions at Chartwell.  On or about March 22, 2019, Kevin Case, Yadira Trejo, Stephanie Hernandez, Ivettelis Nieves, Azsane'a Holland, Kelly Slagle, and Cathy Clark resigned from their positions at Chartwell.

58.     Upon information and belief, each of these former employees immediately began working for Empire.

59.     Upon information and belief, Nieves, Rebultan, Case, and Clark have also solicited and/or conspired to solicit current employees of Chartwell to leave Chartwell and work for Empire.

<u>**Solicitation of Customers and Temporary Employees.**</u>

60.     Upon information and belief, Chartwell alleges Defendants have been contacting customers of Chartwell to solicit their business and to terminate their contracts with Chartwell.

61.     Specifically, on or about March 15, 2019, Benavides and Cornejo visited Revolve Clothing, a customer of Chartwell, where approximately 32 Chartwell employees worked.  Benavides and Cornejo arranged for meetings with small groups of Chartwell employees at Revolve Clothing, whereby they handed out Empire employment applications to Chartwell employees.  Benavides and Cornejo informed the Chartwell employees that they were no longer with Chartwell, and did

BRYAN CAVE LEIGHTON PAISNER LLP
3161 MICHELSON DRIVE, SUITE 1500
IRVINE, CALIFORNIA 92612-4414

BRYAN CAVE LEIGHTON PAISNER LLP
3161 MICHELSON DRIVE, SUITE 1500
IRVINE, CALIFORNIA 92612-4414

1  not want to leave the Chartwell employees at Revolve Clothing "behind."  The

2  Chartwell employees were cornered and encouraged to complete the Empire

3  employment applications.

4      62.    As a direct result of Benavides and Cornejo's meetings with the

5  Chartwell employees placed at Revolve Clothing, no less than 9 Chartwell

6  employees terminated their employment with Chartwell.  Upon information and

7  belief, Chartwell alleges each of these employees immediately began working for

8  Empire.

9      63.    On or about March 19, 2019, Cornejo and another Empire employee

10 visited a job site of Granitize Products, Inc., another client of Chartwell, where

11 approximately 4 Chartwell employees worked.  Cornejo and the other Empire

12 employee made false representations to the Chartwell employees that Chartwell was

13 "going under" and that if they wanted to keep their jobs, they needed to fill out the

14 applications and begin working for Empire.

15     64.    On or about March 20, 2019, Cornejo, Rebultan, Alanis, and another

16 Empire employee returned to the Granitize job site, where they again claimed

17 Chartwell would soon be out of business, and told the Chartwell employees that they

18 should join Empire if they wanted to keep their jobs at Granitize.

19     65.    Around the same time, Gonzalez also visited Caplugs, another

20 Chartwell customer, where she met with Chartwell employees and asked them to fill

21 out Empire employment applications if they wanted to continue working there.

22     66.    Hanks has contacted current customers of Chartwell, including but not

23 limited to Aquamar, Inc. to solicit business for Empire.

24     67.    Nieves, Case, and Clark have also sent email correspondence to current

25 customers of Chartwell, in an attempt to solicit their business for Empire.

26 ///

27 ///

28 ///

## FIRST CLAIM FOR VIOLATION OF 18 U.S.C. § 1836

### (Defend Trade Secrets Act)

### (Chartwell Against All Defendants and Does 1-10)

68.    Chartwell realleges and incorporates by this reference paragraphs 1-67 of this complaint.

69.    Chartwell owns confidential information not available to the public, including but not limited to Chartwell's customer lists, including information relating to customers' business affairs, special needs, preferred methods of doing business, methods of operation, key contact personnel, job order specifications and the particular characteristics and requirements of persons generally hired by a client, specific job listings, mailing lists, computer runoffs, financial and other information; employee information, including the names, addresses, telephone numbers, qualifications, education, accomplishments, experience, availability, resumes and other data regarding persons who have applied or been recruited for temporary or permanent employment; as well as Chartwell's manuals, methods, forms, techniques and systems, developed for its own use and/or use by its customers (collectively, the "Confidential Trade Secret Information").

70.    The Confidential Trade Secret Information is and was a trade secret belonging to Chartwell at all relevant times.

71.    The Confidential Trade Secret Information also relates to services used in, or intended for use in, interstate commerce.  Specifically, Chartwell works with clients in multiple states.  Chartwell routinely assigns employees to customer jobs located across state lines.

72.    Defendants misappropriated Confidential Trade Secret Information belonging to Chartwell, without Chartwell's consent or authorization by, among other things:

(a)    Improperly downloading or otherwise taking Chartwell's customer list and employee list from Chartwell's database without Chartwell's

BRYAN CAVE LEIGHTON PAISNER LLP
3161 MICHELSON DRIVE, SUITE 1500
IRVINE, CALIFORNIA 92612-4414

1    knowledge or consent, using the internet, from Pennsylvania, for use in

2    California among other states;

3    (b)   Communicating with customers of Chartwell, for the primary purpose

4          of inducing customers to terminate their contracts with Chartwell and

5          soliciting their business for the benefit of Empire;

6    (c)   Communicating with employees of Chartwell, for the primary purpose

7          of soliciting their employment with Empire; and

8    (d)   Otherwise using Chartwell's Confidential Information for Empire.

9    73.   As a direct result of Defendants' conduct, Chartwell was harmed in an

10   amount to be proven at trial.  Further, Defendants were unjustly enriched by

11   obtaining business using Confidential Trade Secret Information they improperly

12   acquired.

13   74.   As a further result of the foregoing misappropriation, Chartwell has

14   incurred attorneys' fees and costs, and will continue to incur attorneys' fee and costs

15   in an amount to be proven at trial.

16   75.   In doing the acts alleged in this Complaint, Defendants acted with

17   oppression, fraud, and/or malice, therefore entitling Plaintiff to punitive damages.

18   76.   Chartwell further seeks injunctive relief, enjoining Defendant from

19   using the Confidential Information in any manner.

20   **SECOND CLAIM FOR VIOLATION OF CAL. CIV. CODE § 3426 *ET SEQ.***

21   **(California Uniform Trade Secrets Act)**

22   **(Chartwell against All Defendants and Does 1-10)**

23   77.   Chartwell realleges and incorporates by this reference paragraphs 1-76

24   of this complaint.

25   78.   Chartwell owns confidential information not available to the public,

26   including but not limited to Chartwell's customer lists, including information

27   relating to customers' business affairs, special needs, preferred methods of doing

28   business, methods of operation, key contact personnel, job order specifications and

BRYAN CAVE LEIGHTON PAISNER LLP
3161 MICHELSON DRIVE, SUITE 1500
IRVINE, CALIFORNIA 92612-4414

the particular characteristics and requirements of persons generally hired by a client, specific job listings, mailing lists, computer runoffs, financial and other information; employee information, including the names, addresses, telephone numbers, qualifications, education, accomplishments, experience, availability, resumes and other data regarding persons who have applied or been recruited for temporary or permanent employment; as well as Chartwell's manuals, methods, forms, techniques and systems, developed for its own use and/or use by its customers (collectively, the "Confidential Trade Secret Information").

79.     The Confidential Trade Secret Information is and was a trade secret belonging to Chartwell at all relevant times.

80.     Defendants misappropriated Confidential Trade Secret Information belonging to Chartwell, without Chartwell's consent or authorization by, among other things:

(e)     Improperly taking Chartwell's customer list and employee list from Chartwell's database without Chartwell's knowledge or consent;

(f)     Communicating with customers of Chartwell, for the primary purpose of inducing customers to terminate their contracts with Chartwell and solicit their business for the benefit of Kidan;

(g)     Communicating with employees of Chartwell, for the primary purpose of soliciting their employment with Kidan; and

(h)     Otherwise using Chartwell's Confidential Information for Kidan, doing business as Empire.

81.     As a direct result of Defendants' conduct, Chartwell was harmed in an amount to be proven at trial.  Further, defendants were unjustly enriched by obtaining business using Confidential Information they improperly acquired.

82.     As a further result of the foregoing misappropriation, Chartwell has incurred attorneys' fees and costs, and will continue to incur attorneys' fee and costs in an amount to be proven at trial.

BRYAN CAVE LEIGHTON PAISNER LLP
3161 MICHELSON DRIVE, SUITE 1500
IRVINE, CALIFORNIA 92612-4414

83.     In doing the acts alleged in this Complaint, Defendants acted with oppression, fraud, and/or malice as defined in Civil Code section 3294, therefore entitling Plaintiff to punitive damages.

84.     Chartwell further seeks injunctive relief, enjoining Defendants from using the Confidential Trade Secret Information in any manner.

## THIRD CLAIM FOR INDUCING BREACH OF CONTRACT

### (Chartwell against Empire, Kidan and DOES 1-5)

85.     Chartwell realleges and incorporates by this reference paragraphs 1-84 of this complaint.

86.     Chartwell had valid Employment Agreements with Alanis, Benavides, Case, Clark, Cornejo, Diaz, Gonzales, Hanks, Nieves, and Rebultan.  Knowing each of these defendants had a valid contract with Chartwell, Kidan and Empire, intended to cause each of them to breach their respective Employment Agreements by:

(a)     Taking Confidential Trade Secret Information without Chartwell's knowledge or consent;

(b)     Using Confidential Trade Secret Information without Chartwell's knowledge or consent;

(c)     Soliciting employees of Chartwell for the benefit of Kidan and his company, Empire; and

(d)     Soliciting customers of Chartwell for the benefit of Kidan and his company, Empire.

87.     Kidan and Empire's conduct caused Alanis, Benavides, Case, Clark, Cornejo, Diaz, Gonzales, Hanks, Nieves, and Rebultan, and each of them, to breach their Employment Agreements with Chartwell.

88.     As a direct result of Kidan and Empire's actions, Chartwell was harmed in an amount to be proven at trial.

BRYAN CAVE LEIGHTON PAISNER LLP
3161 MICHELSON DRIVE, SUITE 1500
IRVINE, CALIFORNIA 92612-4414

89.     In doing the acts alleged in this Complaint, Kidan and Empire acted with oppression, fraud, and/or malice as defined in Civil Code section 3294, therefore entitling Chartwell to punitive damages.

## FOURTH CLAIM FOR INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS

### (Chartwell against All Defendants and DOES 1-10)

90.     Chartwell realleges and incorporates by this reference paragraphs 1-89 of this complaint.

91.     Chartwell had a valid contract with Revolve Clothing ("Revolve"), Granitize Products, Inc. ("Granitize"), and Caplugs, whereby Chartwell placed temporary employees with Revolve, Granitize, and Caplugs.

92.     Chartwell further has or had valid contracts with employees placed on temporary assignments at Revolve, Granitize, and Caplugs.

93.     Defendants, knowing Chartwell had a valid contract with Revolve Granitize, and Caplugs, contacted Revolve, Granitize, and Caplugs to terminate its contract with Chartwell and begin a business relationship with Empire.

94.     On or about March 15, 2019, Benavides and Cornejo visited Revolve Clothing, a customer of Chartwell, where approximately 32 Chartwell employees worked.  Benavides and Cornejo arranged for meetings with small groups of Chartwell employees at Revolve Clothing, whereby they handed out Empire employment applications to Chartwell employees.  Benavides and Cornejo informed the Chartwell employees that they were no longer with Chartwell, and did not want to leave the Chartwell employees at Revolve Clothing "behind."  The Chartwell employees were encouraged to complete the Empire employment applications.

95.     On or about March 19, 2019, Cornejo and another Empire employee visited a job site of Granitize Products, Inc., another client of Chartwell, where approximately 4 Chartwell employees worked.  Cornejo and the other Empire employee made false representations to the Chartwell employees that Chartwell was

BRYAN CAVE LEIGHTON PAISNER LLP
3161 MICHELSON DRIVE, SUITE 1500
IRVINE, CALIFORNIA 92612-4414

"going under" and that if they wanted to keep their jobs, they needed to fill out the Empire applications.

96.     On or about March 20, 2019, Cornejo, Rebultan, Alanis, and another Empire employee returned to the Granitize job site, where they again claimed Chartwell would soon be out of business, and that the Chartwell employees should join Empire if they wanted to keep their jobs at Granitize.

97.     Around the same time, Gonzalez also visited Caplugs, another Chartwell customer, where she met with Chartwell employees and asked them to fill out Empire employment applications if they wanted to continue working there.

98.     Hanks has contacted current customers of Chartwell, including but not limited to Aquamar, Inc. to solicit business for Empire.

99.     Nieves, Case, and Clark have also sent email correspondence to current customers of Chartwell, in an attempt to solicit their business for Empire.

100.    Upon information and belief, Defendants also contacted other customers of Chartwell, including but not limited to Stepstone and Cal Western, to solicit their business and convince Chartwell employees working there to terminate their employment with Chartwell and work for Empire.

101.    Defendants intended to disrupt Chartwell's contractual relationship with Chartwell's customers, including Revolve, Granitize, Caplugs, Stepstone, Cal Western, and Aquamar, or knew disruption was certain or substantially certain to occur.

102.    Defendants further intended to disrupt Chartwell's contractual relationship with the Chartwell employees at Revolve, Granitize, Caplugs, Stepstone, Cal Western, and Aquamar, or knew disruption was certain or substantially certain to occur.

103.    As a direct result of Defendants' actions, Chartwell was harmed as a result.

BRYAN CAVE LEIGHTON PAISNER LLP
3161 MICHELSON DRIVE, SUITE 1500
IRVINE, CALIFORNIA 92612-4414

BRYAN CAVE LEIGHTON PAISNER LLP
3161 MICHELSON DRIVE, SUITE 1500
IRVINE, CALIFORNIA 92612-4414

104.   In doing the acts alleged in this Complaint, Defendants acted with oppression, fraud, and/or malice as defined in Civil Code section 3294, therefore entitling Chartwell to punitive damages.

## FIFTH CLAIM FOR BREACH OF CONTRACT

### (Chartwell against Alanis, Benavides, Case, Clark, Cornejo, Diaz, Gonzales, Hanks, Nieves, Rebultan, and DOES 6-10)

105.   Chartwell realleges and incorporates by this reference paragraphs 1-104 of this complaint.

106.   Alanis, Benavides, Case, Clark, Cornejo, Diaz, Gonzales, Hanks, Nieves, and Rebultan each entered into an Employment Agreement with Chartwell.

107.   Chartwell performed all conditions and obligations on its part under each respective Employment Agreement mentioned herein.

108.   On March 6, 2019, two days before her resignation from Chartwell and while on vacation, Diaz logged into Chartwell's database containing Confidential Trade Secret Information, including Chartwell's list of customers and list of temporary employees Chartwell placed with customers.

109.   Upon information and belief, Chartwell alleges Diaz improperly transmitted the information from the database, without Chartwell's knowledge or consent.

110.   Upon information and belief, Chartwell alleges Alanis, Benavides, Case, Clark, Cornejo, Gonzales, Hanks, Nieves, and Rebultan in concert with Diaz in accessing Chartwell's database and downloading information from the database without Chartwell's knowledge or consent.

111.   Upon information and belief, Chartwell alleges Alanis, Benavides, Case, Clark, Cornejo, Diaz, Gonzales, Hanks, Nieves, and Rebultan have been contacting customers of Chartwell to solicit their business and to terminate their contracts with Chartwell.

112.   On or about March 15, 2019, Benavides and Cornejo visited Revolve Clothing, a customer of Chartwell, where approximately 32 Chartwell employees worked.  Benavides and Cornejo arranged for meetings with small groups of Chartwell employees at Revolve Clothing, whereby they handed out Empire employment applications to Chartwell employees.  Benavides and Cornejo informed the Chartwell employees that they were no longer with Chartwell, and did not want to leave the Chartwell employees at Revolve Clothing "behind."  The Chartwell employees were encouraged to complete the Empire employment applications.

113.   On or about March 19, 2019, Cornejo and another Empire employee visited a job site of Granitize Products, Inc., another client of Chartwell, where approximately 4 Chartwell employees worked.  Cornejo and the other Empire employee made false representations to the Chartwell employees that Chartwell was "going under" and that if they wanted to keep their jobs, they needed to fill out the Empire applications.

114.   On or about March 20, 2019, Cornejo, Rebultan, Alanis, and another Empire employee returned to the Granitize job site, where they again claimed Chartwell would soon be out of business, and that the Chartwell employees should join Empire if they wanted to keep their jobs at Granitize.

115.   Around the same time, Gonzalez also visited Caplugs, another Chartwell customer, where she met with Chartwell employees and asked them to fill out Empire employment applications if they wanted to continue working there.

116.   Upon information and belief, Chartwell alleges all of the defendants named herein acted in concert with each other in meeting with Chartwell employees at Revolve, Granitize, and Caplugs, and promulgating false statements regarding the financial status of Chartwell in an attempt to coerce Chartwell employees to terminate their contracts with Chartwell and work for Empire.

BRYAN CAVE LEIGHTON PAISNER LLP
3161 MICHELSON DRIVE, SUITE 1500
IRVINE, CALIFORNIA 92612-4414

117.   Alanis, Benavides, Case, Clark, Cornejo, Diaz, Gonzales, Hanks, Nieves, and Rebultan, and each breached their respective Employment Agreements with Chartwell, by, among other things:

(a)   Taking Confidential Trade Secret Information, as defined in their respective Employment Agreements, without Chartwell's knowledge or consent;

(b)   Using Confidential Trade Secret Information, as defined in their respective Employment Agreements, without Chartwell's knowledge or consent;

(c)   Soliciting employees of Chartwell for the benefit of Kidan; and

(d)   Soliciting customers of Chartwell for the benefit of Kidan.

118.   As a direct result of the breaches of Alanis, Benavides, Case, Clark, Cornejo, Diaz, Gonzales, Hanks, Nieves, and Rebultan, Chartwell has suffered damages and requests damages as a result of this breach, in an amount to be proven at trial.  Chartwell estimates damages of no less than $800,000, as a result of defendants' breach of their Employment Agreements.  Chartwell is further entitled to an award of attorneys' fees and costs pursuant to Section 11 of the Employment Agreements with Benavides, Hanks, Nieves, Case, Alanis, and Cornejo; and Section 6 of the Employment Agreements with Diaz, Gonzalez, Clark and Rebultan.

## SIXTH CLAIM FOR CONVERSION

### (Chartwell against Kidan and DOES 1-5)

119.   Chartwell realleges and incorporates by this reference paragraphs 1-118 of this complaint.

120.   Kidan, in his capacity as an officer of Chartwell, took money from Chartwell, using Chartwell funds to pay for his personal expenses and to pay a woman with whom he was allegedly romantically involved.  Specifically:

BRYAN CAVE LEIGHTON PAISNER LLP
3161 MICHELSON DRIVE, SUITE 1500
IRVINE, CALIFORNIA 92612-4414

BRYAN CAVE LEIGHTON PAISNER LLP
3161 MICHELSON DRIVE, SUITE 1500
IRVINE, CALIFORNIA 92612-4414

a. In 2017, Kidan withdrew approximately $12,000 in increments of $100 to $500 from Chartwell's debit account for personal use.  He never repaid the amounts he took from Chartwell's accounts.

b. In 2017, Kidan received a pay advance of $30,000.00.  Kidan was to repay $500 every week until the advance was repaid.  Kidan stopped making payments, and still owes Chartwell a balance of $16,000.00.

c. From at least 2015 to March 8, 2019, Kidan routinely used Chartwell credit cards and funds to pay for his personal expenses.  Specifically, in 2018, Kidan expensed approximately $76,764.71 of his personal expenses, including Porsche lease payments of $2,258.76 per month and purchases from Tiffany & Co and Jimmy Choo, and countless cash withdrawals.  Despite Chartwell's demands, Kidan has failed to pay the amounts owed.

d. From January 2017 to January 2018, Kidan placed Elizabeth Harris on Chartwell's payroll.  Upon information and belief, Ms. Harris had a romantic relationship with Kidan.  Ms. Harris has never worked for Chartwell.  Chartwell paid Ms. Harris approximately $95,230.20 in gross wages from January 2017 to January 2018.

121.   As a result, Kidan intentionally and substantially interfered with Chartwell's use of its personal property.

122.   Chartwell did not consent to Kidan's use of its money for his personal expenses, or to pay another person who was not employed by, nor did any work for, Chartwell.

123.   As a direct result of Kidan's actions, Chartwell was harmed in an amount to be proven at trial.  Chartwell estimates damages of no less than $500,000 as a result of Kidan's theft.

## SEVENTH CLAIM FOR BREACH OF FIDUCIARY DUTY

### (Chartwell against Kidan and DOES 1-5)

124.   Chartwell realleges and incorporates by this reference paragraphs 1-123 of this complaint.

125.   As an officer of Chartwell, Kidan owed a fiduciary duty of loyalty and confidentiality to Chartwell.  Kidan's fiduciary duties include a duty to act with the utmost good faith in the best interest of Chartwell.

126.   Kidan knowingly acted against Chartwell's interests in soliciting employees of Chartwell to resign from Chartwell with him, while he was still acting as an officer of Chartwell.  He further induced those employees to breach their contracts with Chartwell and terminate their employment with Chartwell.

127.   Kidan knowingly acted against Chartwell's interest in embezzling money from Chartwell's accounts, and fraudulently using Chartwell's accounts to pay for his personal expenses.

128.   In 2017, Kidan withdrew approximately $12,000 in increments of $100 to $500 from Chartwell's debit account for personal use.  He never repaid the amounts he took from Chartwell's accounts.

129.   In 2017, Kidan also received a pay advance of $30,000.00.  Kidan was to repay $500 every week until the advance was repaid.  Kidan stopped making payments, and still owes Chartwell a balance of $16,000.00.

130.   From at least 2015 to March 8, 2019, Kidan routinely used Chartwell credit cards and funds to pay for his personal expenses.  Specifically, in 2018, Kidan expensed approximately $76,764.71 of his personal expenses, including Porsche lease payments of $2,258.76 per month and purchases from Tiffany & Co and Jimmy Choo, and countless cash withdrawals.  Despite Chartwell's demands, Kidan has failed to pay the amounts owed.

BRYAN CAVE LEIGHTON PAISNER LLP
3161 MICHELSON DRIVE, SUITE 1500
IRVINE, CALIFORNIA 92612-4414

BRYAN CAVE LEIGHTON PAISNER LLP
3161 MICHELSON DRIVE, SUITE 1500
IRVINE, CALIFORNIA 92612-4414

131. Further, from January 2017 to January 2018, Kidan placed Elizabeth Harris on Chartwell's payroll. Upon information and belief, Ms. Harris had a romantic relationship with Kidan.

132. Ms. Harris has never worked for Chartwell. Chartwell paid Ms. Harris approximately $95,230.20 in gross wages from January 2017 to January 2018.

133. In March 2019, Chartwell discovered that Kidan had borrowed money from various entities offering cash advances, claiming, among other things, that he had an ownership interest in Chartwell to induce those entities to lend money to Chartwell. Kidan took these cash advances, with extremely high interest rates, and used the proceeds for his own personal expenses.

134. Specifically, Kidan represented to Straight Line Source, a loan broker, that he was the "Owner" of Chartwell, to obtain a merchant credit loan.

135. Kidan further represented to TVT Capital that he had an ownership interest in Chartwell, presenting a fraudulent certificate for 200 shares of Chartwell, to obtain a cash advance.

136. Chartwell was forced to repay a sum of $578,620.90, for a cash advance of $404,630 Kidan obtained under the auspices of acting as an officer of Chartwell.

137. Further, Kidan knowingly acted against Chartwell's interest in directing other Defendants named herein to aid and abet him in soliciting employees and customers by, among other things, taking and using Confidential Trade Secret Information belonging to Chartwell without its knowledge or consent, and promulgating defamatory statements regarding Chartwell's financial stability to solicit employees and customers of Chartwell.

138. Chartwell did not give consent, let alone informed consent, to Kidan's conduct.

139. As a direct result of Kidan's conduct, Chartwell was harmed in an amount to be proven at trial, but no less than $1,000,000.

140.   Chartwell further seeks injunctive relief, enjoining Kidan from (a) soliciting, and conspiring to solicit, any customers using confidential, trade secret information belonging to Chartwell; and (b) promulgating, or conspiring to promulgate, defamatory statements regarding Chartwell's financial stability, or any other false statements regarding Chartwell, to solicit customers and/or employees of Chartwell.

141.   In doing the acts alleged in this Complaint, Defendants acted with oppression, fraud, and/or malice, therefore entitling Plaintiff to punitive damages.

## EIGHTH CLAIM FOR VIOLATION OF BUSINESS AND PROFESSIONS CODE SECTION 17200 *ET SEQ.*

### (Chartwell against All Defendants)

142.   Chartwell realleges and incorporates by this reference paragraphs 1-141 of this complaint.

143.   Defendants' conduct constitutes unlawful, unfair, and/or fraudulent business practices in violation of the Business and Professions Code section 17200 *et seq.* Defendants have engaged in unlawful, unfair, and/or fraudulent business practices by, among other things:

(a)   Breaching the Employment Agreements;

(b)   Intentionally interfering with Chartwell's contracts with current customers and employees by, among other things, promulgating false statements regarding Chartwell's financial condition;

(c)   Inducing other employees to breach their Employment Agreements with Chartwell;

(d)   Using Chartwell's accounts to pay for personal expenses; and

(e)   Breaching fiduciary duties of loyalty and confidentiality.

144.   As a direct and proximate result of Defendants' conduct, Chartwell is entitled to restitution in an amount to be proven at trial and/or injunctive relief.

BRYAN CAVE LEIGHTON PAISNER LLP
3161 MICHELSON DRIVE, SUITE 1500
IRVINE, CALIFORNIA 92612-4414

## **PRAYER**

Chartwell prays for judgment against Defendants as follows:

1.    For an Order enjoining Defendants from:

      (a)    soliciting, and conspiring to solicit, any customers using Confidential, Trade Secret Information belonging to Chartwell; and

      (b)    soliciting, and conspiring to solicit, any current employees of Chartwell using Confidential Trade Secret Information belonging to Chartwell;

2.    For restitution of all amounts Defendants improperly obtained;

3.    For damages in an amount to be proven at trial, including but not limited to pre- and post-judgment interest;

5.    For punitive damages as a result of Defendants' fraudulent, malicious and/or oppressive conduct;

6.    For attorneys' fees and costs, where allowed; and

7.    For such other relief as the Court may deem just and proper.

Dated:  April 4, 2019

Aileen M. Hunter
Traci G. Choi
**BRYAN CAVE LEIGHTON PAISNER LLP**


By:  _/s/ Traci G. Choi_
     Traci G. Choi
Attorneys for Plaintiff
CHARTWELL STAFFING SERVICES INC.

BRYAN CAVE LEIGHTON PAISNER LLP
3161 MICHELSON DRIVE, SUITE 1500
IRVINE, CALIFORNIA 92612-4414