1  David W. Affeld, Cal. Bar. No. 123922
       dwa@agzlaw.com
2  Christopher Grivakes, Cal. Bar No. 127994
       cg@agzlaw.com
3  Damion Robinson, Cal. Bar. No. 262573
       dr@agzlaw.com
4  Affeld Grivakes LLP
   2049 Century Park East, Suite 2460
5  Los Angeles, California 90067
   Tel.:   (310) 979-8700
6  Fax:   (310) 979-8701

7  Attorneys for Plaintiffs Atlantic Solutions Group, Inc.,
   Adam Kidan, Tony Alanis, Jamie R. Diaz, and Patricia Hanks

8

9              **UNITED STATES DISTRICT COURT**

10             **CENTRAL DISTRICT OF CALIFORNIA**

11                  **SOUTHERN DIVISION**

| | |
|---|---|
| 12  CHARTWELL STAFFING SERVICES INC., a New York corporation, | Case No. 8:19-cv-00642 JLS (JDEx) |
| 13 | |
| 14                         Plaintiff, | (Lead Case: 8:19-cv-00639) |
| 15        vs. | **DEFENDANTS' FURTHER OPPOSITION TO PLAINTIFF'S *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND REQUEST TO ISSUE ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION** |
| 16  ATLANTIC SOLUTIONS GROUP, INC., a Delaware corporation doing business as Empire Workforce Solutions, *et al.* | |
| 17 | |
| 18                        Defendants. | |
| 19 | [Filed concurrently: (1)   Declaration of Adam Kidan; (2)   Declaration of Jamie Diaz; |
| 20 | (3)   Declaration of Haynes Dallas; (4)   Declaration of Denise Gonzalez; |
| 21 | (5)   Declaration of Marlene Cornejo; (6)   Declaration of Damion Robinson] |
| 22 | |

23        Defendants Atlantic Solutions Group, Inc. ("Empire"), Adam Kidan ("Kidan"),

24  Tony Alanis ("Alanis"), Rosa Benavides, Marlene Cornejo, Jamie Diaz ("Diaz"),

25  Denise Gonzaliez, Patricia Hanks, and Nick Rebultan (collectively, the "Empire

26  Parties") hereby oppose the *Ex Parte* Application and Request to Issue Order to Show

27  Cause regarding Preliminary Injunction of plaintiff Chartwell Staffing Services, Inc.

28  ("Chartwell").

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **TABLE OF CONTENTS**

I.    INTRODUCTION ....................................................................................... 2

II.    FACTS ....................................................................................................... 4

    A.    The Staffing Industry  ..................................................................... 4

    B.    Kidan Founds Chartwell  ................................................................. 5

    C.    Tracy Kidan and Lilley Oust Kidan  ............................................... 6

    D.    Lilley's Failed Buyout Proposal  .................................................... 6

    E.    Empire Took No Trade Secrets from Chartwell  ............................ 7

    F.    Empire's Contacts with Customers and Temporary Staff  ............. 8

III. LEGAL STANDARD.................................................................................. 8

IV. CHARTWELL'S APPLICATION IS PROCEDURALLY DEFECTIVE...... 9

    A.    Chartwell Is Abusing the *Ex Parte* Procedure  ............................ 9

    B.    Chartwell Has Failed to Follow the Local Rules  .......................... 10

    C.    Chartwell Has Not Posted a Bond.................................................. 11

V. CHARTWELL'S CLAIMS FAIL ON THE MERITS.................................. 11

    A.    Empire Did Not Misappropriate Anything from Chartwell............. 11

        1.    Diaz Did Not Take Chartwell's Alleged Trade Secrets  ........ 11

        2.    Chartwell Has No Evidence of Misuse................................... 13

        3.    Chartwell's Conspiracy Theories Are False and Irrelevant  .. 14

        4.    Chartwell Cannot Enjoin Speculative Future Music  ............. 15

    B.    Chartwell Fails to Articulate a Trade Secret................................... 16

        1.    Chartwell Has Failed to Define Its Supposed Trade Secret  .. 16

        2.    Chartwell's Customers Are Not a Trade Secret ..................... 17

            a. Business & Professions Code § 16607 Does Not Apply.... 17

            b. Chartwell Has Previously Argued that the Same Information Is not a Trade Secret ...................................................... 18

            c. Customer Lists Alone Are Not Trade Secrets ................... 18

        3.    Empire's Customer Lists Do Not Satisfy the Standard for Trade Secrets.......................................................................... 19

            a. General industry information is not a trade secret.............. 20

OPPOSITION TO *EX PARTE* APPLICATION FOR TRO

1

2          b. Chartwell does not reasonably protect its "secrets" .......... 21

           C.    Chartwell is Trying to Enjoin "Solicitation" Rather than
                 Misappropriation ................................................................. 21

3   VI. CHARTWELL DOES NOT SATISFY ANY OF THE RULE 65
    FACTORS ................................................................................................. 22
4

5          A.    Chartwell Has Failed to Identify Irreparable Harm ......................... 23

6          B.    The Balance of Hardships Tips Lopsidedly in Empire's Favor....... 23

7          C.    The Public Interest Is Not Served by Halting Competition ............ 24

8   VII. CHARTWELL'S PROPOSED INJUNCTION CANNOT BE
    ENFORCED .............................................................................................. 24
9   VIII. CONCLUSION ........................................................................................ 26

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

OPPOSITION TO *EX PARTE* APPLICATION FOR TRO

# <u>TABLE OF AUTHORITIES</u>

**CASES**

*Agency Solutions.com, LLC v. Trizetto Group, Inc.*, 819 F. Supp. 2d
   1001, 1015 (E.D. Cal. 2011)...................................................................11, 13, 16

*Am. Paper & Packaging Prods. v. Kirgan*, 183 Cal.App.3d 1318 (1986) 14, 18, 20

*Am. Passage Media Corp. v. Cass Comm'ns Inc.*, 750 F.2d 1470, 1473-
   74. .........................................................................................................................23

*AMN Healthcare, Inc. v. Aya Healthcare Servs., Inc.*, 28 Cal. App. 5th
   923, 944 (2018)....................................................................................17, 20, 22

*Bayer Corp. v. Roche Molecular Sys., Inc.*, 72 F. Supp. 2d 1111, 1120
   (N.D. Cal. 1999). .............................................................................................11, 15

*Car–Na–Var Corp. v. Moseley*, 24 Cal.2d 104, 110 (1944)......................15, 21, 24

*Central Valley Gen. Hosp. v. Smith*, 162 Cal. App. 4th 501, 528-29 (2008 .........13

*Computer Sciences Corp. v. Computer Assocs. Int'l, Inc.*, 1999 WL
   675446, at *6 (C.D. Cal. Aug. 12, 1999)...........................................................15

*Corning Inc v. PicVue Elecs., Ltd.*, 365 F.3d 156, 158 (2d Cir. 2004) .................25

*Courtesy Temporary Service, Inc. v. Camacho*, 222 Cal. App. 3d 1278
   (1990)...................................................................................................................14

*Danjaq LLC v. Sony Corp.*, 1999 WL 317629, at *1 n.1 (C.D. Cal. Mar.
   11, 1999). ...........................................................................................................15

*Diodes, Inc. v. Franzen*, 260 Cal. App. 2d 244, 253 (1968). ...............................16

*DISH Network Corp. v. F.C.C.*, 653 F.3d 771, 776 (9th Cir. 2011). ................9, 22

*Ernest Paper Prods. v. Mobil Chem. Co.*, 1997 WL 3348520..............................14

*ET Trading Ltd. v. ClearPlex Direct LLC*, 2015 WL 913911, at *3 (N.D.
   Cal. Mar. 2, 2015).............................................................................................23

*Fitness Concepts LLC v. Hodson*, 2011 WL 13220421, at *3 (C.D. Cal.
   May 27, 2011).....................................................................................................19

*FLIR Sys., Inc. v. Parrish*, 174 Cal. App. 4th 1270, 1277 (2009)............11, 13, 15

*Gallagher Benefit Servs. v. De La Torre*, 283 F. App'x 543, 545 (9th Cir.
   2008) ...................................................................................................................12

*Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015). ...................................9

*GEO Group, Inc. v. United States*, 100 Fed. Cl. 223, 226 (Fed. Cl. 2011)............8

*Giftango, LLC v. Rosenberg*, 925 F. Supp. 2d 1128, 1140 (D. Or. 2013).............23

OPPOSITION TO *EX PARTE* APPLICATION FOR TRO

*Glacern Machine Tools, LLC v. Sun*, 2011 WL 5075620 at *2 (C.D. Cal.
Oct. 25, 2011). ................................................................................... 23

*Goldie's Bookstore, Inc. v. Superior Court*, 739 F. 2d 466, 471-72 (9th
Cir. 1984). ......................................................................................... 23

*Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1167-68 (9th Cir.
1998). ................................................................................................. 16

*League of Wilderness Defendants/Blue Mountains Biodiversity Project v.
Connaughton*, 752 F.3d 755, 765 (9th Cir. 2014). ............................. 23

*Mattel, Inc. v. MGA Entm't, Inc.*, 782 F. Supp. 2d 911, 967-68 (C.D. Cal.
2011). ............................................................................................. 2, 22

*Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) ..................................... 8

*MedioStream, Inc. v. Microsoft Corp.*, 689 F. Supp. 2d 1095, 1113 (N.D.
Cal. 2012). ......................................................................................... 16

*Metro Traffic Control, Inc. v. Shadow Traffic Network*, 22 Cal. App. 4th
853, 864 (1994) ............................................................................ 19, 20

*Mission Power Eng'g Co. v. Continental Cas. Co.*, 883 F. Supp. 448, 490
(C.D. Cal. 1995) ................................................................................... 9

*Mitigation Techs. v. Pennartz*, 2015 WL 12656936, at *7 (C.D. Cal. Mar.
13, 2015) ............................................................................................ 20

*Morales v. Prolease PRO, LLC*, 2011 WL 6740329, at *1 (C.D. Cal. Dec.
22, 2011) .............................................................................................. 9

*Morlife, Inc. v. Perry*, 56 Cal. App. 4th 1514 (1997) ............................. 18

*Natural Res. Def. Council, Inc. v. Winter*, 508 F.3d 885, 886 (9th Cir.
2007) .................................................................................................. 25

*Pellerin v. Honeywell Int'l, Inc.*, 877 F. Supp. 2d 983, 988–89 (S.D. Cal.
2012). ................................................................................... 13, 161, 17

*Pollara v. Radiant Logistics Inc.*, 2014 WL 12585781, at *6-7 (C.D. Cal.
June 6, 2014) ................................................................................. 18, 19

*Pollara v. Radiant Logistics, Inc.*, 2014 WL 12584445, at *3 (C.D. Cal.
Aug. 5, 2014) ..................................................................................... 19

*Sammartano v. First Judicial District Corut*, 303 F.3d 959, 974 (2002) .............. 24

*Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) ....................................... 25

*Scott v. Snelling & Snelling, Inc.*, 732 F. Supp. 1034, 1044-45 (N.D. Cal.
1990) .................................................................................................. 19

*SOS Co., Inc. v. E-Collar Techs.*, 2012 WL 12897998, at *4 (C.D. Cal.
Oct. 17, 2012) .................................................................................... 14

*Space Data Corp. v. X*, 2017 WL 5013363, at *2 (N.D. Cal. Feb. 16,

- 5 -

2017) .......................................................................................................... 16

*SRI Int'l v. Acoustic Imaging Tech. Corp.*, 1993 WL 356896, at *4 (N.D. Cal. Sept. 3, 1993) .......................................................................................... 25

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) .................................................................................................... 23

*Syngenta Crop. Protection, Inc. v. Helliker*, 138 Cal. App. 4th 1135, 1173 (2006) .......................................................................................... 16, 20

*Syngenta*, 138 Cal. App. 4th at 1172. ...................................................... 20

*The Ret. Grp. v. Galante*, 176 Cal. App. 4th 1226, 1237-38 (2009) .............. 13, 21

*Vendavo, Inc. v. Price f(x) AG*, 2018 WL 1456697, at *4 (N.D. Cal. Mar. 23, 2018). ................................................................................................ 16

*Veronica Foods Co. v. Ecklin*, 2017 WL 2806706 ................................... 11,13

*Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982). ................................. 9

*Winter v. Natural Res. Def. Council*, 555 U.S. 7 (2008) .......................... 8, 9, 22, 24

STATUTES

18 U.S.C. § 1836 ............................................................................................. 11

18 U.S.C. § 1839 ............................................................................................. 20

Cal. Bus. & Prof. Code § 16600 ........................................................... 15, 21, 24

California Business & Professions Code § 16607 ..................................... 17

California Civil Code § 3426 .................................................................. 11, 20

Fed. R. Civ. P. 65 .................................................................................... 8, 11

OTHER AUTHORITIES

*The Surprising Virtues of Treating Trade Secrets as IP Rights*, 61 Stan. L. Rev. 311, 344 (2008) ..................................................................... 16

OPPOSITION TO *EX PARTE* APPLICATION FOR TRO

# I.    INTRODUCTION

The Court should deny Chartwell's preemptive TRO application because it is premature, wrong on the law, and wrong on the facts.  In its rush to file an opportunistic TRO application the Thursday before a holiday weekend, Chartwell neglected established rules of procedure, ignored settled trade-secrets law, and rewrote the basic facts to suit its position.  It is improperly using trade-secrets law as a ruse to smother a fledgling competitor, Empire, in the cradle.

The motion gets the facts glaringly wrong.  Chartwell accuses the Empire Parties of a secret conspiracy while they were still employed by Chartwell to siphon off customers and employees.  As part of this conspiracy, Chartwell claims that Kidan "secretly and without making any disclosure to Chartwell of his actions, incorporated Atlantic Solutions Group, Inc., doing business as Empire" to compete with Chartwell.  App. at p. 10.  This is demonstrably untrue.  In reality, Chartwell's CEO *signed a contract with Atlantic* on November 30, 2018, for Atlantic to provide consulting services.  Chartwell's CEO, William Holmes' Lilley ("Lilley") signed the contract.  Kidan ceased being an officer, director, or employee of Chartwell at that time.

Kidan repeatedly spoke to Lilley about the competing business he was starting.  He made clear that certain employees—who had been with Kidan since he started Chartwell—might join him in this business.  Lilley offered Kidan up to $1,000,000 not to compete.  Kidan declined.  If this amounts to a secret conspiracy to set up a competing business, it is the most poorly executed secret conspiracy in history.

In reality, Chartwell is trying to do in the guise of trade-secret protection what it could not do by contract – *i.e.*, prevent the Empire Parties from competing with it.  Neither California law nor federal law allows it to prevent a competitor from seeking business from its clients.  As this Court has recognized, all too often, employers use "trade secret law as a weapon against employee mobility," *Mattel, Inc. v. MGA Entm't, Inc.*, 782 F. Supp. 2d 911, 967-68 (C.D. Cal. 2011).

Chartwell has fully weaponized the trade-secret law.  It fails to identify any

actual trade secret that it believes Empire misappropriated, but asserts that the Empire Parties have "*presumably*" taken some portion of 23 categories of confidential information. It asks the Court to speculate—without any evidence—that the Empire Parties must be using this information to compete. Its speculative, unsupported application fails for a host of independently sufficient reasons.

*First*, as detailed in the Initial Opposition, Chartwell is abusing the *ex parte* process. It failed to give proper notice and fails to identify an emergency.

*Second*, the Empire Parties did not misappropriate anything. As Chartwell concedes, its only evidence is that a then-current Chartwell employee, Diaz, accessed a database—which she routinely used for her work—for two minutes. Chartwell "presumes" that she stole vast "Confidential Trade Secret Information" and that Empire must be using it. Courts do not grant expansive TROs on speculation.

Diaz did not steal anything. A customer asked Diaz for specific information that he needed urgently for an insurance renewal. Despite being off, Diaz helped him by downloading and sending him the information he asked for. She did not access or download anything else. Kidan emphatically told Empire's employees *not* to bring information with them and they listened. Empire has no trade secrets of Chartwell.

*Third*, Chartwell has failed to establish that it actually has a trade secret. It does not define its supposed "trade secret" except in the most amorphous fashion – *i.e.*, "confidential, proprietary information in all formats." This circular definition cannot survive a pleading challenge, much less justify an injunction. The only information it identifies with any specificity is the identities of its customers and employees. This information is not a trade secret as a matter of law. Instead, Chartwell is improperly seeking an injunction prohibiting Empire from competing for Chartwell's customers, which established law forbids.

*Fourth*, even if Chartwell could establish likely misappropriation—and it utterly fails to do so—it has not established the basic requirements for injunctive relief – *i.e.*, irreparable harm, a balance of hardships in its favor, or public interest.

Chartwell, a nationwide company with hundreds of millions of dollars in revenue, will
not suffer irreparable harm by having to compete with Empire until Empire establishes
that it is competing fairly.  In contrast, an injunction—just a few months into Empire's
existence—could well put it out of business.  Courts do not lightly grant injunctions
restraining competition.

*Fifth*, and finally, the injunction that Chartwell seeks is too broad and vague to
be enforceable.  At best, it is a blanket injunction to follow the law.  At worst, it
invites unending future proceedings if Empire does business with any Chartwell
customer.  Injunctions, particularly those restraining trade, must be narrowly tailored.

Chartwell has rushed into court for an expansive injunction without the
thinnest evidentiary support.  Its arguments amount to hearsay and speculation.  It has
not bothered to even comply with the Federal Rules or the Court's Local Rules.  The
motion must be denied.

Instead, Empire respectfully requests that the Court set a briefing schedule on
cross-motions for preliminary injunctive relief in which Empire will demonstrate that
Chartwell has engaged in a campaign of anti-competitive conduct, which threatens
Empire's ability to stay in business.

## II.    FACTS

Chartwell is one of the country's largest staffing companies with revenue in the
hundreds of millions of dollars.  Empire is a startup company in the staffing business
formed four months ago.

### A.    The Staffing Industry.

The staffing industry is highly competitive.  There are approximately 16,000
staffing companies in the U.S., and 3,000 operating in California.  It is also tight-knit.
Competitors routinely vie for the same customers—businesses in need of temporary
staff—and discuss their business prospects with one another.  Kidan Decl. ¶ 2.

Experienced salespeople know what potential customers are in play, who and

1  who they currently use for staffing.  It is customary for staffing companies to pitch the

2  same clients, including clients of other companies.  It is also customary for clients to

3  not only interview multiple staffing agencies, but to have multiple staffing agencies at

4  the same time due to their staffing needs.  Kidan Decl. ¶ 3.

5  **B.   Kidan Founds Chartwell**

6  Kidan founded Chartwell in approximately December 2011.  Kidan Decl. ¶ 1.

7  His wife, Tracy Kidan, owned all of the stock, but was not involved in management.

8  All of the stock of Chartwell was treated as a marital asset, and is currently subject to

9  Kidan's divorce proceeding with Tracy Kidan.  *Id.*

10  Kidan has had various roles at Chartwell, including as its managing director and

11  secretary until 2016, and its CEO from August 2017 through November 2018.  He has

12  also hired various executives as CEO.  In November 2018 he was replaced by Lilley

13  as CEO due to the pending divorce with Tracy Kidan.  *Id.* ¶ 6.

14  Kidan grew Chartwell into a company with over hundreds of millions of dollars

15  in revenue by 2016.  A large part of its growth was acquiring staff from Corporate

16  Resource Services, Inc. ("CRS"), which went bankrupt in 2015.    Kidan Decl. ¶ 7.

17  Many of the CRS personnel came to Chartwell seeking jobs.  They brought with them

18  multiple clients, including all but one of the customers in Chartwell's application:

19  Granitize, Caplugs, Cal-Western, Stepstone and Aquamar.[1]  *Id.*  These employees

20  brought with them the same knowledge from CRS that Chartwell is now claiming

21  constitute its "trade secrets."  *Id.*

22  CRS sued Chartwell, claiming that Chartwell had misappropriated its trade

23  secrets.  Chartwell denied this.  It took the position that the industry knowledge and

24  customers brought by CRS staff could not constitute trade secrets.  This is the same

25  information that Chartwell now claims is its own trade secret.  Kidan Decl. ¶ 7.

26

27

28
[1] Revolve Clothing came to Chartwell because its client contact had a personal relationship with Marlene Cornejo, and reached out to her after moving from a different company.

OPPOSITION TO *EX PARTE* APPLICATION FOR TRO

**C.    Tracy Kidan and Lilley Oust Kidan.**

Kidan ceased being involved in Chartwell on a day-to-day basis in November 2018 due to the divorce.  In the fall of 2018, as part of the divorce proceedings, Chartwell explored refinancing and a possible sale of the company.  Kidan Decl. ¶¶ 8-9.  It was contemplated that Kidan would step away from management, that Lilley would replace him as CEO, and that Todd Oken would become its COO.  *Id.*  It was anticipated that Kidan would either step away entirely or remain on as a consultant.

During this same period, Kidan discussed with Lilley, Oken, and Tracy Kidan, that he would form an independent entity that would provide consulting services while Chartwell sought refinancing or a sale.  Kidan Decl. ¶ 9.   The entity he formed was Atlantic Solutions Group, Inc., which now does business as Empire.  *Id.*

Lilley prepared a consulting agreement between Chartwell and Empire in November 2018.  Kidan Decl. ¶ 9 & ex. 2.  Lilley signed that agreement on or about December 1, 2018.  *Id.*  Oken then sent an email to Chartwell executives announcing that "Kidan's status will change and he'll no longer be paid as a W2.  Adam and Chartwell now have a consulting agreement in place."  *Id.*, Ex. 3.

At that time, Kidan stopped participating in management.  He communicated with Lilley only infrequently.  He stopped attending weekly phone conferences or coming into the office regularly.  Kidan Decl. ¶ 10.

**D.    Lilley's Failed Buyout Proposal.**

In January 2019, Kidan informed Lilley that he was planning to join a company called Distinctive Workforce Solutions, which is a master service provider.  He also discussed selling his interest in Chartwell to Lilley or Tracy Kidan.  Kidan Decl. ¶ 11.

The parties had a series of buyout discussions through February 2019.  As part of these discussions, Lilley proposed a letter of intent ("LOI") with a non-compete clause.  Kidan Decl ¶ 12 & Ex. 4.  The clause was extremely broad, and was unacceptable to Kidan.  Kidan made clear that he intended to stay in the staffing industry, and to compete with Chartwell.  *Id.* ¶ 12.

OPPOSITION TO *EX PARTE* APPLICATION FOR TRO

The parties were unable to negotiate a buyout.  At one point, Lilley offered Kidan $1,000,000 to sign a non-compete prohibiting him from competing with Chartwell for five years.  Kidan Decl. ¶ 13.  Kidan declined.  *Id.*

After the negotiations with Lilley and Tracy Kidan fell through, Kidan decided to leave Chartwell and to repurpose Atlantic as a staffing company.  *Id.* ¶ 14.  On March 8, 2019, Kidan announced that he was resigning completely from Chartwell. Kidan Decl. ¶ 8; Cornejo Decl. ¶ 7; Gonzalez Decl. ¶¶ 3-4.

### E. Empire Took No Trade Secrets from Chartwell.

Chartwell contends that former employee, Diaz, presumably downloaded its trade secrets while accessing the Chartwell "CRM" and "MOS" databases on March 6, 2019, two days before she resigned from Chartwell.

In reality, a Chartwell customer, Managed Facilities Solutions, LLC ("MFS"), urgently needed information for an insurance renewal, including a Certificate of Insurance.  *See* Decl. of Haynes Dallas ¶¶ 3-4.  Because of the slow response time of Chartwell's main office, MFS contacted Diaz to request the insurance renewal information.  *Id.* ¶ 5.

Diaz downloaded the requested information from Chartwell's database immediately.  Diaz Decl. ¶¶ 7-10.  She did not download anything other than the specific information requested by MFS.  *Id.* ¶¶ 10-11.  She then sent the information to MFS as requested.  *Id.* ¶ 12.

Kidan publicly announced his departure from Chartwell on March 8, 2019. Kidan Decl. ¶ 8; Cornejo Decl. ¶ 7; Gonzalez Decl. ¶¶ 3-4.  He did not solicit Chartwell employees to leave Chartwell, or even tell them about Empire.  *See* Diaz Decl. ¶ 5; Cornejo Decl. ¶ 7; Gonzalez Decl. ¶ 4.  Many of those employees elected to leave Chartwell, and reached out to Alanis and Kidan after resigning due to management changes Chartwell put in place following Kidan's departure.  Cornejo Decl. ¶¶ 8-11; Gonzalez Decl. ¶¶ 5-9.

Kidan specifically and emphatically instructed all of the former Chartwell

employees who decided to join Empire not to bring any information or materials with them from Chartwell.  Kidan Decl. ¶ 15.   Empire does not have, has never had, and has not used any confidential or trade secret information of Chartwell.  *Id.*; *see also* Diaz Decl. ¶ 13, Cornejo Decl. ¶¶ 14-15; Gonzalez Decl. ¶ 11-14.

### F.    Empire's Contacts with Customers and Temporary Staff.

The customers that Chartwell accuses Empire of poaching are those whom Chartwell acquired from CRS, and who have long-standing personal relationships with Empire employees.  Cornejo Decl. ¶¶ 16-28.   The customers Empire has visitedhave invited Empire to visit and discuss its services upon learning that their longtime contacts are no longer with Chartwell. *Id.*

These clients have also invited and encouraged Empire to meet with temporary staff to have them apply for placement through Empire.  Cornejo Decl. ¶¶ 168-28.  Otherwise, Empire would have no ability to meet with the staff.  Empire has only met with temporary staff after being invited and encouraged to do so by the prospective clients.  *Id.*

## III.   <u>LEGAL STANDARD</u>

An *ex parte* TRO may be granted only if supported by evidence that "clearly show[s] that *immediate and irreparable injury*, loss, or damage will result to the movant before the adverse party can be heard."  Fed. R. Civ. P. 65(b)(1)(A).  A preliminary injunction "is an extraordinary and drastic remedy," and cannot be granted "unless the movant, *by a clear showing*, carries its burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).  This standard is heightened where the plaintiff seeks a TRO in addition to an injunction. *Id.*; *see also* **GEO Group, Inc. v. United States**, 100 Fed. Cl. 223, 226 (Fed. Cl. 2011).  Preliminary injunctions are "never awarded as a matter of right."  *Winter*, 555 U.S. at 24.

To obtain a preliminary injunction, the plaintiff must "demonstrate that it meets all four of the elements the preliminary injunction test established in *Winter v. Natural*

1 *Res. Def. Council*, 555 U.S. 7 (2008)."  *DISH Network Corp. v. F.C.C.*, 653 F.3d 771,

2 776 (9th Cir. 2011).  Those factors are: (a) that it is "likely to succeed on the merits,"

3 (b) it is likely to suffer "irreparable harm" absent an injunction; (c) the balance of

4 hardships "tips in its favor," and (d) an injunction will serve the public interest.

5 *Winters*, 555 U.S. at 20.  Likelihood of success is the "most important" factor.  *Garcia*

6 *v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015).   Without a showing of likely

7 success, the analysis ends.  *Id.* at 744.  Moreover, a preliminary injunction may only

8 issue if the plaintiff demonstrates "irreparable injury and the inadequacy of legal

9 remedies."  *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982).  The

10 irreparable harm must be "likely," not merely "possible."  *Winter*, 555 U.S. at 22.

11

12 **IV.    CHARTWELL'S APPLICATION IS PROCEDURALLY DEFECTIVE**

13       **A.    Chartwell Is Abusing the *Ex Parte* Procedure.**

14       "Ex parte applications are for extraordinary relief only."  Judge's Procedures,

15 Hon. Josephine L. Staton ¶ 3.  They are "extremely limited" and to be used for

16 emergencies only.  *Morales v. Prolease PRO, LLC*, 2011 WL 6740329, at *1 (C.D.

17 Cal. Dec. 22, 2011) (citation omitted); *see also Mission Power Eng'g Co. v.

18 Continental Cas. Co.*, 883 F. Supp. 448, 490 (C.D. Cal. 1995) (*ex parte* "rarely

19 justified").  They "throw . . . out of whack" the framework set out in the Rules for

20 "fair, orderly, and efficient resolution of disputes," and "usually for no good reason."

21 *Morales*, 2011 WL 6740329, at *1; *see also* Fed. R. Civ. P. 1.

22       TRO applications are not meant as a dress rehearsal for trial or to get a sneak

23 peek at the merits without affording the opponent a full and fair chance to respond.

24 Judge's Procedures ¶ 3.  They are meant to address real emergencies – *e.g.*, "that the

25 tomatoes are about to spoil or the yacht is about to leave the jurisdiction and [] all

26 will be lost."  *Mission Power*, 883 F. Supp. at 490.  Filing one "is the forensic

27 equivalent of standing in a crowded theater and shouting, "Fire!'"  *Id.*  As the Court

28 has warned overzealous lawyers before:  "There had better be a fire."  *Id.*

1    As set out in the Empire Parties' Initial Opposition [24], there is no fire.
2    Chartwell spent six weeks compiling its 27-page brief and 11 declarations.  By mid-
3    March, its counsel asserted that they had "reason to believe [that Empire] intend[ed]
4    to use trade secret information."  Affeld Decl. ¶ 1.  It has been accumulating
5    supporting declarations since then.  *See* Gillespie Decl., Dkt. No. 18-1, at p. 2 (dated
6    March 29, 2019).  Most of them were signed the first week of April.  Decls. of Guay
7    [18-9], Perez [18-11], Kooiman [18-3], La Bella [18-5], and Temblador [18-6].

8    If there were truly a risk of "imminent and irreparable harm," Chartwell would
9    not have waited six weeks to seek a TRO.  Instead, it took its time preparing a
10   massive brief and supporting evidence—which amounts, primarily, to hearsay and
11   speculation—and then waited until an opportune moment to spring it on Empire.  It
12   has not even served its complaint.  It did not sue until after Empire sued it first.  It sat
13   on its supporting declarations for weeks.  The leisurely pace at which Chartwell got
14   around to filing its TRO papers, and its opportunistic timing, belie any emergency.

15   **B.   Chartwell Has Failed to Follow the Local Rules.**

16   Chartwell also failed to give proper notice of its application.  The movant must
17   "make reasonable, good faith efforts ***orally*** to advise counsel for all other parties," of
18   the date and substance of the application."  Local Rule 7-19.1.  It must also to "advise
19   the Court in writing and under oath" of these efforts and any opposition.  *Id*.

20   Chartwell concedes that it has not followed (or even attempted to follow)
21   Local Rule 7-19.1.  App. at 4; Choi Decl., Dkt. 18-14, ¶¶ 2-5; Affeld Decl. ¶¶ 5-7.
22   Instead, Chartwell notified the Empire Parties of its intent to seek an *ex parte* TRO by
23   emailing counsel a copy of its ***already-filed*** moving papers.  Affeld Decl. ¶ 8.  It sent
24   at least one of the victims of its TRO barrage a copy of its papers ***by ordinary mail***.
25   Judge's Procedures ¶ 3 ("the movant shall serve the opposing party be electronic
26   filing . . .; otherwise . . . by email, fax, or personal service").

27   Expansive injunctive relief should not issue without even minimal due process.
28

- 15 -

C.     **Chartwell Has Not Posted a Bond.**

A TRO cannot be issued without a bond.  Fed. R. Civ. P. 65(c) ("only if the movant gives security"); *see also* Standing Order, Dkt. No. 14 ("Parties seeking emergency or provisional relief shall comply with Fed. R. Civ. P. 65); *see also* L.R. 65-3 to 65-10 (detailed bonding requirements).  Chartwell seeks a TRO that could well put Empire out of business—as it was designed—but does not even bother to address the bonding requirement.  Its application also fails on this basis alone.

# V.     CHARTWELL'S CLAIMS FAIL ON THE MERITS

To establish trade secret misappropriation under California Civil Code § 3426 ("CUTSA") the plaintiff must plead and prove (1) that it owned a trade secret; (2) that the defendant "acquired, disclosed, or used" its trade secret "through improper means"; and (3) this conduct damaged the plaintiff.  *Agency Solutions.com, LLC v. Trizetto Group, Inc.*, 819 F. Supp. 2d 1001, 1015 (E.D. Cal. 2011). The elements under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, are "substantially identical.".  *See* 18 U.S.C. § 1839(5); *see also Veronica Foods Co. v. Ecklin*, 2017 WL 2806706, at *12 (courts consider analysis under CUTSA and DTSA cases).

A.     **Empire Did Not Misappropriate Anything from Chartwell.**

"[S]peculation that a departing employee may misappropriate and use a trade secret in a startup business will not support an injunction."  *FLIR Sys., Inc. v. Parrish*, 174 Cal. App. 4th 1270, 1277 (2009).  An injunction cannot be granted "on mere suspicion or apprehension of injury."  *Id.* at 1279.  "A trade-secrets plaintiff must show an actual use or an actual threat."  *Bayer Corp. v. Roche Molecular Sys., Inc.*, 72 F. Supp. 2d 1111, 1120 (N.D. Cal. 1999).

1.     **Diaz Did Not Take Chartwell's Alleged Trade Secrets.**

The sole fact Chartwell offers is that Diaz accessed its CRM and MOS databases for two minutes, two days before leaving.  It fails to identify what information she accessed.  Despite having unilateral access to all of the evidence for

weeks, all it can state is that she "presumably" downloaded unspecified information. App at p. 4 ("accessed and ***presumably*** took Chartwell's [trade secrets] by downloading CRM and MOS, without Chartwell's consent"); *id.* at p. 11 ("***presumably*** did, export the information . . . which she downloaded onto a hard drive or emailed").  Chartwell offers literally no evidence that Diaz actually took anything.

Chartwell's own purported technical expert, Taylor Guay confirms this.  *See* Guay Decl., Dkt. No. 18-9.  All he can say is that Diaz "accessed" two related databases for a total of two minutes on March 6, 2019.  Guay Decl. ¶ 8.  Guay then speculates about what Diaz *could have* downloaded—without saying that she did download anything at all. *id.* at ¶ 6.  Chartwell employees access the databases every day.  Routine use of a company database while still employed is not malfeasance.

It would be reversible error to use this speculation for a TRO.  In *Gallagher Benefit Servs. v. De La Torre*, 283 F. App'x 543, 545 (9th Cir. 2008) the Ninth Circuit found that the trial court had abused its discretion by granting an injunction based on forensic evidence that an employee "likely copied a large volume of computer files." It noted that the evidence failed to demonstrate "that any of these accessed files were trade secrets."  Chartwell does not even show that Diaz downloaded anything.

As confirmed both by Diaz and Chartwell customer MFS, MFS contacted Diaz on March 6 urgently needing specific information for its insurance renewal.  Diaz accessed Chartwell's system to get the customer the information he urgently needed. That was it.  This does not amount to misappropriation of trade secrets.

Equally telling, Chartwell does not identify any other Empire employee who accessed anything.  It does not even speculate as to what information Empire supposedly has or is supposedly using.  Instead, Kidan specifically instructed Chartwell employees not to bring anything with them from Chartwell—fearing exactly this sort of frivolous lawsuit.  They followed Kidan's instructions.  Empire does not have any of Chartwell's trade secrets.

## 2.    Chartwell Has No Evidence of Misuse.

Even if the Court indulged Chartwell's speculation, "mere possession of trade secrets is not enough." *Pellerin v. Honeywell Int'l, Inc.*, 877 F. Supp. 2d 983, 988–89 (S.D. Cal. 2012). This is settled law. *FLIR Sys.*, 174 Cal. App. 4th at 1279 ("Mere possession of trade secrets by a departing employee is not enough for an injunction.") (citing *Central Valley Gen. Hosp. v. Smith*, 162 Cal. App. 4th 501, 528-29 (2008)). To support an injunction, the plaintiff must show "a threat by a defendant to misuse trade secrets, manifested by words or conduct, where the evidence indicates imminent misuse." *Id.* (citation omitted). Chartwell submits no such evidence.

It does not even articulate what information Diaz supposedly took. *See Agency Solutions.com*, 819 F. Supp. 2d 1015 ("it is crucial . . . that the information claimed to have been misappropriated be clearly identified"). It does nothing to tie its mass of purported "Confidential Trade Secret Information" to any of the conduct that it complains about on the part of Empire.

At best, it claims that Empire has "solicit[ed] clients and employees." App. at p. 19.[2] But, courts do not—and cannot—grant injunctions against solicitation on its own. *The Ret. Grp. v. Galante*, 176 Cal. App. 4th 1226, 1237-38 (2009) ("It is not the solicitation of the former employer's customers, but is instead the misuse of trade secret information, that may be enjoined.") Without a showing that Empire has used trade secret information, no injunction can issue.

Chartwell has wholly failed to show that the Empire Parties are using trade secret information. For example, it does not suggest that the Empire Parties used its pricing data, customer preferences, wage data (which it publishes online), or other information. It does not even show that Empire is using—or has any need for—its customer lists. Pointing to a laundry list of data and saying, in essence, my competitor must be using something, does not fly. *Veronica Foods*, 2017 WL 2806706, at *14

---

[2] Chartwell gripes that Empire has discussed its financial status, but makes clear that Empire's supposed statements were "false." App. at p. 4. False information cannot be a trade secret. Moreover, Chartwell's ailing financial status is no secret. *See* Robinson Decl., Ex. 1.

("there is no specific allegation to support the conclusion that [plaintiff's] relationship with the particular stores poached by [defendant] . . . were trade secrets").

The mere fact that the Empire Parties have had contact with customers of Chartwell is not evidence of misappropriation. Chartwell's customers are well-known in the industry and serviced by multiple staffing agencies. The customers Chartwell gripes about are personal contacts of Empire's managers. Empire's managers have worked with these customers since *before they became customers of Empire*. With a single exception, all of them were clients of these managers at CRS, who then brought their books of business to Chartwell. Chartwell fails to explain—and, instead, ignores—this obvious problem. It got these clients the same way as Empire – *i.e.*, by hiring managers with personal client relationships. If the clients are a trade secret (and they are not), they are not a trade secret of Chartwell.

### 3.    Chartwell's Conspiracy Theories Are False and Irrelevant.

Chartwell tries to make up for its lack of evidence with wild accusations of a conspiracy. It relies heavily on *Courtesy Temporary Service, Inc. v. Camacho*, 222 Cal. App. 3d 1278 (1990), *see* App. at 20-21. *Courtesy* is totally inapposite.

For one thing, Chartwell is relying on an unfair competition theory in *Courtesy* that has been "expressly rejected" by this Court as superseded by CUTSA. *See SOS Co., Inc. v. E-Collar Techs.*, 2012 WL 12897998, at *4 (C.D. Cal. Oct. 17, 2012) (citing cases for proposition that *Courtesy* is superseded by CUTSA; granting motion to dismiss). The power to enjoin solicitation is limited to cases of "overwhelming," "unrefuted," and "admitted" misappropriation. *Ernest Paper Prods. v. Mobil Chem. Co.*, 1997 WL 3348520, at *8. Except in these extreme circumstances, courts require the plaintiff to show that actual trade secrets are being used. *See SOS Co., Inc.*, 2012 WL 12897998, at * 4 (where this is disputed "*American Paper* is the better authority"); *Am. Paper & Packaging Prods. v. Kirgan*, 183 Cal.App.3d 1318 (1986).

Chartwell has failed to bring this case within the extreme circumstances of *Courtesy*. In fact, it misrepresents the facts in claiming that the Empire Parties "led by

Kidan, conspired to start a competing business while still employed."  App. at 21.

Kidan has not been employed by Chartwell since December 1, 2018—as Chartwell's own emails make clear.  Indeed, although it claims that Kidan formed Empire in secret, App. at p. 10 (citing Choi Decl., Ex. 3), in reality Chartwell *hired Empire as an independent contractor*.  Chartwell admits that Kidan and Lilley had meetings about Kidan's competing business.  McKenney Decl., Dkt. No. 18-7 at ¶¶ 2-3 ("spoke with Mr. Kidan ***and Mr. Lilley***").  Lilley offered up to $1,000,000 for Kidan not to start a new business, which Kidan declined.

This is not evidence of a surreptitious scheme to unlawfully compete.  Kidan was fully transparent—while being ousted from Chartwell by his estranged wife with Lilley's help—that he intended to start a competing venture.  Doing so was an exercise of his established right to freely compete.  *Car–Na–Var Corp. v. Moseley*, 24 Cal.2d 104, 110 (1944) ("every individual possesses as a form of property, the right to pursue any calling, business or profession he may choose"); Cal. Bus. & Prof. Code § 16600 ("every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void").

### 4.    Chartwell Cannot Enjoin Speculative Future Misuse.

Because Chartwell has no evidence that the Empire Parties are using its trade secrets, it tries to "fill in the gaps" by suggesting that they *must be* using that information because they are competing.  *Danjaq LLC v. Sony Corp.*, 1999 WL 317629, at *1 n.1 (C.D. Cal. Mar. 11, 1999).  State and federal courts have uniformly rejected this theory of "inevitable disclosure" or "inevitable misuse."  *Danjaq LLC v. Sony Corp.*, 1999 WL 317629, at *1 n.1 (C.D. Cal. Mar. 11, 1999); *see also Flir Sys.*, 174 Cal. App. 4th at 1277.  Inevitable disclosure "is not the law of the State of California or the Ninth Circuit."  *Danjaq LLC*, 1999 WL 317629, at *1 n.1; *Computer Sciences Corp. v. Computer Assocs. Int'l, Inc.*, 1999 WL 675446, at *6 (C.D. Cal. Aug. 12, 1999); *Bayer*, 72 F. Supp. 2d at 1119 (same).

**B.    Chartwell Fails to Articulate a Trade Secret.**

**1.    Chartwell Has Failed to Define Its Supposed Trade Secret.**

While Chartwell is not required to lay its trade secret out in full detail on the public docket, it must provide enough specificity "to permit the defendant to ascertain at least the boundaries within which the secret lies." *Pellerin*, 877 F. Supp. 2d at 988 (emphasis added); *Diodes, Inc. v. Franzen*, 260 Cal. App. 2d 244, 253 (1968). "Conclusory and generalized allegations are insufficient." *Vendavo, Inc. v. Price f(x) AG*, 2018 WL 1456697, at *4 (N.D. Cal. Mar. 23, 2018).  A party cannot resort to a "high-level overview" rather than specifics. *Space Data Corp. v. X*, 2017 WL 5013363, at *2 (N.D. Cal. Feb. 16, 2017).  The plaintiff must "'carry its burden of identifying for the court' exactly what information was claimed to be a trade secret." *Agency Solutions.com*, 819 F. Supp. at 1015 (quoting *Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1167-68 (9th Cir. 1998)).

The plaintiff also bears the burden of identifying the specific information it claims a former employee misappropriated. *MedioStream, Inc. v. Microsoft Corp.*, 689 F. Supp. 2d 1095, 1113 (N.D. Cal. 2012).  A specifically-defined trade secret is "a necessary element of [a] count for an injunction." *Syngenta Crop. Protection, Inc. v. Helliker*, 138 Cal. App. 4th 1135, 1173 (2006).  It is not enough to point to a morass of information and say the employee must have taken some undefined part of it.

As courts have repeatedly warned, "plaintiff should be required to 'clearly define what it claims to own, rather than (as happens all too often in practice) falling back on vague hand waiving." *Id.* (quoting M. Lemley, *The Surprising Virtues of Treating Trade Secrets as IP Rights*, 61 Stan. L. Rev. 311, 344 (2008)).  A party cannot assert a broad list of information and ask the Court or the other parties to "hunt through the details in search of items meeting the statutory definition" of a trade secret. *Mattel, Inc.*, 782 F. Supp. 2d at 967-68. (quoting *Imax*, 152 F.3d at 1163-64).

Chartwell's application amounts to "vague hand waiving" of the highest order. Its blunderbuss definition of "Confidential Trade Secret Information" spans a full

page of all "confidential, proprietary information in all formats." App. at 2-3. It goes on to provide a laundry list of general categories, *e.g.*, "other data regarding persons who have applied," and "other financial information." *Id.* It does not identify what, if anything, it believes Diaz took or Empire has. It has simply defined all of its business data as a trade secret and left it up to the Empire Parties and the Court to sort out what constitutes a trade secret and what it believes Empire has. This showing is wholly inadequate for an injunction. *Pellerin*, 877 F. Supp. 2d at 988

### 2. Chartwell's Customers Are Not a Trade Secret.

Although Chartwell lays out a laundry list of purported trade secrets, it appears to focus on its so-called "customer lists." Its customers are not a trade secret.

### a. Business & Professions Code § 16607 Does Not Apply.

Chartwell asserts, without analysis, that its "customer list" is a *per se* trade secret under California Business & Professions Code § 16607(a). Section 16607(a), however, only makes customer lists a trade secret if they are owned by "an employment agency." Chartwell is not an employment agency. It characterizes itself in its papers as a "staffing agency," which is a different type of business. App. at 15.

An "employment agency" is a company hired by prospective "jobseeker[s]" to find them jobs. *See* Cal. Civ. Code § 1812.501(a) ("consideration to be paid, directly or indirectly *by a jobseeker*.") The main feature of an "employment agency" is that its customers are *employees* looking for jobs. *Id.* ("main object[] or purpose" of is procuring employment "for any person who will pay for its services . . . to secure employment"). This is not Chartwell's business.

A staffing agency like Chartwell is not hired or paid by "jobseeker[s]." Its temporary staff are W-2 employees who work for Chartwell. *See AMN Healthcare, Inc. v. Aya Healthcare Servs., Inc.*, 28 Cal. App. 5th 923, 944 (2018) (noting that temporary staff are likely "employees" of the staffing company, not "customers" of an "employment agency"). Its customers are the businesses that use its temporary staff. It is paid by these businesses, not the employees. Chartwell simply does not meet the

statutory definition of an "employment agency."

**b.   Chartwell Has Previously Argued that the Same Information Is Not a Trade Secret.**

As noted above, each of the customers at issue is a former client of CRS.  CRS sued Chartwell in 2015 for misappropriating its trade secrets. Chartwell denied that the business information and customer contacts at issue were trade secrets.   This is the same information Chartwell now claims is a trade secret *belonging to* Chartwell. It cannot explain how customers suddenly became secrets after Chartwell got them.

**c.   Customer Lists Alone Are Not Trade Secrets.**

Chartwell blindly relies on *Morlife, Inc. v. Perry*, 56 Cal. App. 4th 1514 (1997) for the idea that customer lists are trade secrets.  This is not what *Morlife* held. "*Morlife* stands for the limited proposition that customer lists are entitled to protection . . .  only if they include additional non-public customer data that gives [] a competitive advantage." *Pollara v. Radiant Logistics Inc.*, 2014 WL 12585781, at *6-7 (C.D. Cal. June 6, 2014).

The concurring opinion in *Morlife* recognized that this is the absolute outer limit of trade secret protection, finding that the plaintiff had established a trade secret by a "margin . . . [of] about an inch and a half."  *Id.* at 1529 (Kline, P.J., concurring). The concurring opinion made clear that *Morlife* is an "extremely troubling case" because it creates a palpable conflict with the right to employee mobility, and the facts were far more consistent with lawful competition.  *Id.* at 1529-30. The concurring justice warned against using *Morlife* to create "quasi-presumption that an employee can't leave his or her employment and go into competition with the former employer for the business of [its] customers." *Morlife* here.  *Id.* at 1530.

This is exactly what Chartwell seeks to do.  Chartwell has presented evidence *only* of the fact that Empire Parties have had contact with customers and employees. The names and contact information of employees, customers, or business contacts are not trade secrets. *See Am. Paper*, 183 Cal. App. 3d at 1326 (denying trade secret

protection to customer lists because salespeople have contact with many customers);
*Metro Traffic Control, Inc. v. Shadow Traffic Network*, 22 Cal. App. 4th 853, 864
(1994) ("a stable of trained and talented at-will employees does not constitute [a] trade
secret"); *Scott v. Snelling & Snelling, Inc.*, 732 F. Supp. 1034, 1044-45 (N.D. Cal.
1990). "[C]iting to a list of clients, even one labeled 'secret' or 'confidential' is
insufficient to show . . . a protectible trade secret." *Pollara v. Radiant Logistics, Inc.*,
2014 WL 12584445, at *3 (C.D. Cal. Aug. 5, 2014), aff'd 650 F. App'x 372 (9th Cir.
2016). Instead, "the owner must present evidence showing that the 'list' contains
important information that cannot be gleaned from publicly available sources."
*Pollara v. Radiant Logistics, Inc.*, 2014 WL 12585781, at *1 (C.D. Cal. June 6, 2014).

Moreover, "California law unambiguously holds that a former employee's
[personal] relationships with customers are not protectible." *Id.* at *6; *see also 220
Fitness Concepts LLC v. Hodson*, 2011 WL 13220421, at *3 (C.D. Cal. May 27,
2011). Where a former employee "developed the customer lists through their own
efforts, personal knowledge, and business contacts," "a customer list does not
constitute a trade secret." *Scott*, 732 F. Supp. at 1044-45. "That an employee "had
specialized expertise and good relationships with [the plaintiff's] customers does not
convert the otherwise unprotected customer lists into protected trade secrets."
*Pollara*, 650 F. App'x 372, 373-74 (9th Cir. 2016).

As this Court has warned, unthinking reliance on "cases like *Morlife*," will
"blur the distinction" between an employee's client relationships, which cannot be a
trade secret, and specialized information about its preferences, which can. *Pollara*,
2014 WL 1258445, at *3. Doing so improperly reads trade secret law to "impinge on
the rights" of employees to change jobs or to compete. *Id.*

### 3.   Chartwell's Customer Lists Do Not Satisfy the Standard for Trade Secrets.

A trade secret "derives independent economic value, actual or potential, from
not being generally known to the public or other persons," and is subject to reasonable

efforts to protect its secrecy.  Cal. Civ. Code § 3426.1(d)(1)-(2); 18 U.S.C. § 1839(3).  Information that is "readily ascertainable through proper means" cannot be a trade secret.  18 U.S.C. § 1839(3)(B); *Syngenta*, 138 Cal. App. 4th at 1172.

### a.    General industry information is not a trade secret.

As the court recognized in *American Paper*, 183 Cal. App. 3d at 1326, in a highly-competitive industry, where customers use multiple providers, a customer list is not a trade secret.  *See also AMN Healthcare*, 28 Cal. App. 5th at 937-38.  Information that would be "ascertainable to other persons in the [ ] business" cannot be a trade secret.  *Am. Paper*, 183 Cal. App. 3d at 1326.  Information is not a trade secret, where it is available "through public sources, such as business directories."  *Mitigation Techs. v. Pennartz*, 2015 WL 12656936, at *7 (C.D. Cal. Mar. 13, 2015).

Just as in *American Paper* and *AMN*, that the temporary staffing industry is highly competitive, and both clients and salespeople move frequently, bringing their books of business with them.  This is exactly how Chartwell got the clients that it is complaining about.  This type of cross-pollination is routine.  The identity of a company's clients is not a secret to anyone.  It is generally known and widely discussed in the industry.  Many companies publicize their large contracts.  It is now custom for clients not only to interview multiple staffing companies, but to hire from more than one at the same time.  This is exactly the situation described in *American Paper*.  Chartwell's clients are simply not secret.

Likewise, Chartwell cannot assert that its employees working for a given customer are trade secrets.  *See Metro Traffic*, 22 Cal. App. 4th at 864 ("a stable of trained and talented at-will employees").  As Chartwell's declarations make clear, its customers have allowed Empire to meet with the temporary staff on site.  The temporary staff cannot possibly be a trade secret where (a) the Empire Parties have long personal relationships with them, and (b) the customers readily make them available to meet with Empire.  There is no evidence that Empire has obtained, or attempted to obtain, employees through the use of trade secrets.

**b.    Chartwell does not reasonably protect its "secrets."**

Chartwell gives its office staff unfettered access to all of its supposed "trade secret" information.  The two databases identified in its papers are accessible by scores of people.  Chartwell does nothing to segregate access to its customer information, and makes this information broadly available.

It also encourages these employees to take their work home with them, even paying for them to set up home offices from which they can access all of its purported "trade secret" data.  It has done nothing to try to claw this information back—other than sending letters from counsel.

Worse, it has left its supposed trade secrets in storage units *in the names of former employees* for weeks.  These former employees have unfettered access to the supposed "trade secret," even after they left.  One of them had to spend weeks trying to get Chartwell to take over the storage unit—containing a treasure trove of "Confidential Trade Secret Information"—before Chartwell actually did something about it.  This is not a reasonable effort to protect supposedly top-secret data.

**C.    Chartwell is Trying to Enjoin "Solicitation" Rather than Misappropriation.**

In reality, Chartwell is seeking an injunction against solicitation of its customers based on its speculation that the Empire Parties must be using trade secrets in the process.  The law forbids injunctions against solicitation, without proof of misappropriation.  *The Ret Grp*, 176 Cal. App. 4th at 1237-38.

Chartwell's effort to prevent Empire from soliciting its customers or employees defies settled law.  "A former employee has the right to engage in a competitive business for himself and to enter into competition with his former employer, even for the business of those who had formerly been the customers of his former employer, provided such competition is fairly and legally conducted."  *Car–Na–Var Corp. v. Moseley*, 24 Cal.2d 104, 110 (1944); *see* Cal. Bus. & Prof. Code § 16600.  To allow Chartwell to enjoin competition under the guise of trade-secret protection would be to

- 26 -

use "trade secret law as a weapon against employee mobility." *Mattel, Inc. v. MGA Entm't, Inc.*, 782 F. Supp. 2d at 967-68.

The California Court of Appeal affirmed just months ago that an employer cannot prohibit its former employees from soliciting its customers. *AMN Healthcare*, 28 Cal. App. 5th at 937-38 (holding that employer could not enforce non-solicitation provision because it is a void restraint on competition). The court in *AMN Healthcare* also rejected the employer's effort, as Chartwell attempts here, to classify its employees as a trade secret to circumvent this rule. *Id.* at 944-45.

Chartwell misses the point if *AMN*, narrowly restricting its holding. The court in *AMN*, however, also denied trade secret protection because the contact information for nurses, which the employer claimed was its "trade secret," was not actually a trade secret at all. *Id.* at 945. The court noted that the nurses frequently used multiple agencies, had "personal relationships" with recruiters, and the recruiters "sometimes [ ] used" this knowledge to locate nurses contact information. *Id.* at 945. *AMN Healthcare* reiterated the analysis of *American Paper*, which applies here.

Just as in *AMN Healthcare* and *American Paper*, Empire's salespeople know of potential customers because they have been in the industry for years and have serviced those customers at multiple companies. Their knowledge of those customers *before ever going to work with Chartwell* precludes finding that the customer contacts are a trade secret. An injunction cannot issue preventing salespeople from calling on the same customers they have worked with for years before and after Chartwell.

## VI.   CHARTWELL DOES NOT SATISFY ANY OF THE RULE 65 FACTORS

Chartwell's effort to collapse all of the Rule 65 factors into an analysis of its likelihood of success on the merits does not survive *Winter*, 555 U.S. 7. All of the cases that Chartwell cites for the proposition that "imminent use of trade secrets" constitutes irreparable harm pre-date *Winter*. App. at 24-25. After *Winter*, a party

1 must establish every factor for an injunction. *DISH Network*, 653 F.3d at 776.

2 Chartwell pays short shrift to these factors and fails to satisfy any of them.

3     **A.**    **Chartwell Has Failed to Identify Irreparable Harm.**

4     A loss of existing customers is not irreparable harm unless it threatens to put a

5 company out of business. *Am. Passage Media Corp. v. Cass Comm'ns Inc.*, 750 F.2d

6 1470, 1473-74. An established business losing customers can be remedied through

7 damages. *Goldie's Bookstore, Inc. v. Superior Court*, 739 F. 2d 466, 471-72 (9th Cir.

8 1984). Moreover, the harm must be "real and imminent, and not just speculative or

9 potential." *Giftango, LLC v. Rosenberg*, 925 F. Supp. 2d 1128, 1140 (D. Or. 2013).

10     Chartwell's reliance on *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240

11 F.3d 832, 841 (9th Cir. 2001) is misguided. *Stuhlbarg* dealt with a unique situation

12 where a business had its "initial orders from large new customers" detained at

13 customs, and would lose out on significant goodwill without an injunction.

14 *Stuhlbarg* also applied the old "possibility of irreparable harm" standard, which was

15 expressly overruled in *Winter*. *See ET Trading Ltd. v. ClearPlex Direct LLC*, 2015

16 WL 913911, at *3 (N.D. Cal. Mar. 2, 2015). *Stuhlbarg* does not support the idea that

17 any potential loss of customers amounts to irreparable harm.

18     Chartwell is a massive, national company with revenue in the hundreds of

19 millions of dollars. The loss of one or a handful of customers is a drop in the bucket.

20 Of the five customers it identifies, all but one have "continued to do business with

21 Chartwell." App. at 12-13. A major national corporation losing a single customer is

22 not irreparable injury. *See Glacern Machine Tools, LLC v. Sun*, 2011 WL 5075620 at

23 *2 (C.D. Cal. Oct. 25, 2011).

24     **B.**    **The Balance of Hardships Tips Lopsidedly in Empire's Favor.**

25     Chartwell merely asserts, without explanation, that the balance of hardships tips

26 in its favor "because the harms [it] face[s] are permanent, while [Empire] face[s]

27 temporary delay." App. at 26 (quoting *League of Wilderness Defendants/Blue*

28 *Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 765 (9th Cir. 2014)).

1    This platitude is nonsensical in context.  In fact, the exact opposite is true.

2    Chartwell is not seeking mere "temporary delay."  It is seeking to enjoin

3    Empire's salespeople from contacting its customers, until a trial on the merits—

4    months or years from now.  Preliminary injunctions are intended to preserve the *status*

5    *quo*, not radically upend it until the defendant can prove its innocence at trial.

6    The real balancing is between cutting down a startup company in its infancy,

7    versus allowing it to compete with a large corporation until it can demonstrate that it

8    is competing fairly.  The proposed injunction will likely put Empire—which has been

9    operating for about four months—out of business.  It will be unable to compete.  Its

10   salespeople will be unable to do their jobs.  Time is not on Empire's side.  If Empire

11   cannot compete until trial, months or years from now, it will have no business left.

12   ### C.    The Public Interest Is Not Served by Halting Competition.

13   "The public interest inquiry primarily addresses impact on non-parties rather

14   than parties."  *Sammartano v. First Judicial District Corut*, 303 F.3d 959, 974 (2002)

15   overruled on other grounds in *Winter*, 555 U.S. at 22.  The relevant non-parties are

16   potential customers and employees who might choose to work with Empire.

17   Despite the importance of protecting legitimate trade secrets, Chartwell fails to

18   show how protection of its supposed trade secrets impacts anyone other than

19   Chartwell.  It does not.  Instead, Chartwell's army of temporary staff and its myriad

20   customers have a direct and concrete interest in employee mobility and free

21   competition.  They have every right to work for and with whomever they chose, be it

22   Chartwell or Empire.  These rights reflect strong public policy.  *Car–Na–Var Corp.*,

23   24 Cal.2d at 110 (1944); Cal. Bus. & Prof. Code § 16600.  The public interest

24   mandates that the Court not deprive these non-parties of free choice to protect the

25   individual interests of Chartwell, at least until the dispute is decided on its merits.

26

27   ### VII.   **CHARTWELL'S PROPOSED INJUNCTION CANNOT BE ENFORCED.**

28   "Injunctive relief must be tailored to remedy the specific harm alleged, and an

overbroad preliminary injunction is an abuse of discretion." *Natural Res. Def. Council, Inc. v. Winter*, 508 F.3d 885, 886 (9th Cir. 2007).  Injunctions must be "specific[]" and "describe in reasonable detail . . [the] acts restrained."  Fed. R. Civ. P. 65(d).  "[F]airness requires that those enjoined receive explicit notice of precisely what conduct is outlawed." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974); *Corning Inc v. PicVue Elecs., Ltd.*, 365 F.3d 156, 158 (2d Cir. 2004) (noting "dangers inherent in the threat of a contempt citation for violation of an order so vague that an enjoined party may unwittingly. . . violate it.").  Rule 65 is intended to avoid contempt proceedings "on a decree too vague to be understood." *Schmidt*, 414 U.S. at 476.

Because Chartwell has failed to specifically define its trade secrets, its proposed injunction is massively overbroad and vague, and is too opaque to be enforced. As with its application, Chartwell's fails to define the specific information it seeks to enjoin Chartwell from using—much less to show that the information is a *bona fide* trade secret.  Courts do not issue injunctions saying "don't use any of the plaintiff's trade secrets." *See Corning*, 365 F.3d at 158 (overturning injunction that failed to adequately "identify the trade secrets and copyrighted works that it bars [defendant] from, respectively, misappropriating and infringing").  Chartwell's proposed injunction is not narrowly tailored by a wide margin.

Chartwell's injunction amounts to either a blanket order to follow the law, or an effective prohibition on Empire soliciting customers or employees. *See* Proposed Order ¶¶ 2-3 (seeking an injunction against "soliciting" using undefined trade secrets). Neither is proper.  The proposed injunction invites future contempt proceedings if Empire contacts *any* Chartwell employee or customer on the theory—which Chartwell resorts to in its application—that Empire must be using trade secrets.  This effective "no contact" order would have a devastating chilling effect.  Courts do not lightly issue judicially-sanctioned restraints on trade. *See SRI Int'l v. Acoustic Imaging Tech. Corp.*, 1993 WL 356896, at *4 (N.D. Cal. Sept. 3, 1993) (declining to enjoin startup company from selling competing device, noting "public interest is [] served by

1  promoting competition, free from judicial information that is improvident or

2  warranted by only insubstantial grounds").[3]

3

4  **VIII.  <u>CONCLUSION</u>**

5        For the foregoing reasons, the Court should deny Chartwell's *ex parte* and set a

6  briefing schedule on cross-motions for preliminary injunctive relief.

7

8  Dated:  April 22, 2019                     Respectfully submitted,

9

10                                            By: s/ David Affeld
                                              David W. Affeld
11                                            Damion D. D. Robinson
                                              Affeld Grivakes LLP

12                                            Attorneys for Plaintiffs

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27  [3] Chartwell's proposed order ignores the directive of Rule 65 to state the irreparable injury, the reason for not giving standard notice, and the basis for an injunction.  A TRO must "describe the injury and state why it is irreparable; [and] state why the order was issued without notice."  Fed. R. Civ. P. 65(b)(2); see also Fed. R.

28  Civ. P. (d)(1) ("[e]very order granting an injunction . . . . must:  state the reason why it issued).

OPPOSITION TO *EX PARTE* APPLICATION FOR TRO

## <u>CERTIFICATE OF SERVICE</u>

I certify that I electronically filed the foregoing document using the Court's
CM/ECF System.  I am informed and believe that filing through the CM/ECF system
will cause notice to be served on all interested parties.

Damion D. D. Robinson

OPPOSITION TO *EX PARTE* APPLICATION FOR TRO