**CIVIL MINUTES – GENERAL**

Case No.  8:19-cv-00642-JLS-JDE                     Date: May 20, 2019
Title: Chartwell Staffing Services Inc. v. Atlantic Solutions Group Inc., et al

Present: **Honorable JOSEPHINE L. STATON, UNITED STATES DISTRICT JUDGE**

|  Terry Guerrero  |  N/A  |
| --- | --- |
| Deputy Clerk | Court Reporter |

ATTORNEYS PRESENT FOR PLAINTIFF:     ATTORNEYS PRESENT FOR DEFENDANT:

Not Present                                        Not Present

**PROCEEDINGS:   (IN CHAMBERS) ORDER ENTERING PRELIMINARY
                     INJUNCTION**

On April 23, 2019, the Court denied Plaintiff Chartwell Staffing Services Inc.'s Application for a Temporary Restraining Order and ordered Defendants[1] to show cause why a preliminary injunction should not issue.  (TRO Order, Doc. 30.)  The Court considered the memorandum attached to Chartwell's Application as its opening brief in support of a preliminary injunction (Mem, Doc. 18), and Defendants' Further Opposition to Chartwell's Application as their opposition to a preliminary injunction (Opp., Doc. 26).  Chartwell replied (Reply, Doc. 31) and Defendants, with leave of Court, filed a Sur-Reply (Sur-Reply, Doc. 35.)  After holding a hearing, considering the papers, and taking the matter under submission, the Court ENTERS a preliminary injunction against Defendants.

This is a trade-secret misappropriation action, wherein Chartwell claims that Defendants have improperly used Chartwell's confidential information to steal its customers and goodwill.  Chartwell's First Amended Complaint brings five claims for relief, but Chartwell seeks a preliminary injunction based on only two claims: violation of

---

[1] Defendants are Atlantic Solutions Group Inc., doing business as Empire Workforce Solutions ("Empire"); Adam Kidan; Tony Alanis; Rosa Benavides; Marlene Cornejo; Jamie Diaz; Denise Gonzales; Patricia Hanks; and Nick Rebultan.  (*See* First Amended Complaint ("FAC") ¶¶ 3–10, Doc. 11.)

Case No.  8:19-cv-00642-JLS-JDE                    Date: May 20, 2019
Title: Chartwell Staffing Services Inc. v. Atlantic Solutions Group Inc., et al

the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, and the California Uniform Trade Secrets Act ("CUTSA"), Cal. Civ. Code § 3426. [2]  (*See* Mem. at 15.)

## I.    FACTUAL BACKGROUND[3]

Chartwell is a national employee staffing agency established in 2012.  (Lilley Decl. ¶ 4, Doc. 18-12.)  Chartwell recruits and hires individuals as its employees and then assigns them to its customers.  (*See id.*) Chartwell has "dedicated significant resources to compiling information regarding its customers and employees."  (*Id.* ¶ 4.)  Specifically, Chartwell "has spent no less than $15 million developing its customer and employee base."  (*Id.*)  Such information includes:

> customer lists, including information relating to customers' business affairs, special staffing needs, preferred methods of doing business, methods of operation, key contact personnel, mark up rates, pay rates, and other negotiated terms specific to each customer, job order specifications and the particular characteristics and requirements of persons generally hired by the customer, specific job listings, mailing lists, computer runoffs, financial and other information; employee information, including the names, addresses, telephone numbers, qualifications, education, accomplishments, experience, availability, resumes and other data regarding persons who have applied or been recruited for temporary or permanent employment

---

[2] Chartwell's other claims are for conversion against Kidan; breach of fiduciary duty against Kidan; and violation of California's Unfair Competition Law against all Defendants.  (FAC ¶¶ 57–99.)

[3] The Court reviewed and considered all evidence in the record, including all declarations and deposition transcripts.   The parties each filed numerous, boilerplate evidentiary objections.  (Docs. 24-2, 26-7, 32, 37-18.)  "District courts, though, 'may give ... inadmissible evidence some weight ... [to] prevent[ ] irreparable harm before trial.'" *Weride Corp. v. Kun Huan*, 2019 WL 1439394, at *5 (N.D. Cal. Apr. 1, 2019) (quoting *Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009)).  Thus, when considering a preliminary injunction, "evidentiary issues 'properly go to weight rather than admissibility.'" *Id.* (quoting *Go Daddy Operating Co., LLC v. Ghaznavi*, 2018 WL 1091257, at *14 (N.D. Cal. Feb. 28, 2018)).  Thus, the Court takes the objections "under advisement in considering the Motion."  *Id.*

---

_____
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  8:19-cv-00642-JLS-JDE                           Date: May 20, 2019
Title: Chartwell Staffing Services Inc. v. Atlantic Solutions Group Inc., et al

(*Id.* ¶ 5.)  Some of this information is maintained in a proprietary database, called "Customer Relationship Management" ("CRM"), managed by Madison Resources.  (*Id.* ¶ 6.)  CRM contains:

> (1) information about customers, including customer name, contact information preferred contact with customer and method of doing business, business needs and affairs, pricing arrangements, specified needs of customer, job listings, and particular characteristics and requirements of persons generally hired by customer; and
> (2) information about employees, including employees' names, addresses, telephone numbers, qualifications, education, accomplishments, experience, availability, resumes, and other data.

(*Id.* ¶ 7.)  Madison Resources also manages Madison Online Solutions ("MOS") which Chartwell uses to report post-payroll data.  (*Id.* ¶ 8.)  MOS contains Chartwell's accounts receivables, invoices to customers, and other billing information relating to customers. (*Id.* ¶ 8.)

Chartwell's employees can access MOS and CRM only by logging in with credentials uniquely assigned to them.  (*Id.* ¶ 12.)  Upon termination or resignation, Chartwell directs Madison Resources to delete the employees' credentials so that they can no longer access CRM and MOS.  (*Id.*)  Further, Chartwell requires its employees to sign Employment Agreements (*id.* ¶ 11) that prohibit the unauthorized disclosure of Chartwell's "confidential trade secrets."  (*Id.* ¶ 14–20; Employment Agreements, Exhibits 1–7 to Lilley Decl., Doc. 18-13.)   The Agreements define Chartwell's "confidential trade secrets" as Chartwell's "clients, including their business affairs, special needs, preferred methods of doing business, methods of operation, key contact personnel and other data" and "names, addresses, telephone numbers, qualifications, education, accomplishments, experience, availability, resumes and other data regarding persons who have applied or been recruited for temporary or permanent employment by [Chartwell], as well as job order specifications and the particular characteristics and

Case No.  8:19-cv-00642-JLS-JDE                    Date: May 20, 2019
Title: Chartwell Staffing Services Inc. v. Atlantic Solutions Group Inc., et al

requirements or persons generally hired by a client, specific job listings, mailing lists, computer runoffs, financial and other information." (*Id.*)[4]

From 2012 to March 8, 2019, Kidan was one of Chartwell's corporate officers. (*Id.* ¶ 13.)  Specifically, he was Chartwell's Chief Executive Officer from August 2017 to November 2018 (Kidan Decl. ¶ 6, Doc. 26-1) and then its President from November 2018 until March 8, 2019, when he resigned (Lilley Decl. ¶ 28.)  On November 7, 2018, while still employed as Chartwell's President (*id.*), Kidan established Empire, a competing employee staffing agency.[5] (Ex. 3 to Choi Decl., Doc. 18-15.)  At no time while employed at Chartwell did Kidan tell Chartwell that he had formed or intended to form a competing company.  (Supp. Lilley Decl. ¶¶ 16, 20.)  Before Kidan resigned, he solicited some of Chartwell's employees to join him at Empire.  (Lilley Decl. ¶ 29.)  Ultimately, Defendants Alanis, Hanks, Benavides, Cornejo, Diaz, and Gonzales, left Chartwell to work at Empire the same day that Kidan resigned – March 8, 2019.  (*Id.* ¶ 32.)  Defendant Rebultan, along with three other employees, left Chartwell for Empire on March 15, 2019.  (*Id.* ¶ 33.)  Seven more employees left Chartwell for Empire on March 22, 2019. (*Id.* ¶ 34.)

Chartwell initially supported its Motion with evidence that Defendant Diaz improperly accessed and downloaded information from MOS and CRM on March 6, 2019.  (*Id.* ¶ 31.)  While Diaz was on paid-time off granted by Kidan, she accessed CRM and MOS at 7:59 p.m. and 8:00 p.m. respectively.  (*Id.*; Guay Decl. ¶ 8, Doc. 18-9; Exhibits 1 and 2 to Guay Decl., Doc. 18-10.)  Diaz had the ability to export the information contained in CRM and MOS into excel spreadsheets, which can be downloaded to a hard drive or emailed.  (*See* Guay Decl. ¶ 6.)  Chartwell argues that Diaz "presumably" downloaded the information for use at Empire.  (*See* Mem. at 11.)  Diaz, however, attests that she accessed CRM and MOS on March 6, 2019 for proper reasons.

---

[4] Though Gonzales' and Rebultan's Agreements (Exhibits 6 and 7 to Lilley Decl.) are slightly different than the other five Agreements attached, the language concerning disclosure of confidential information is identical.

[5] Kidan states that Empire he originally conceived of Empire as an entity that would provide "consulting services to Chartwell."  (Kidan Decl. ¶ 9.)

Case No. 8:19-cv-00642-JLS-JDE                                  Date: May 20, 2019
Title: Chartwell Staffing Services Inc. v. Atlantic Solutions Group Inc., et al

(Diaz Decl., Doc. 26-2.)  Specifically, one of Chartwell's customers – Managed Facilities Solutions, LLC – asked her to send it insurance information, and she obtained such information from MOS.  (*Id.* ¶¶ 8–10.)  She claims that she did not download any other information from CRM or MOS.  (*Id.* ¶ 10.)  Further, Managed Facilities submitted a declaration corroborating that, at 6:03 p.m. on March 6, 2019, it emailed Diaz and requested the insurance information, and that Diaz replied with the information at 6:06 p.m.  (*See* Dallas Decl. ¶¶ 3–7, Doc. 26-3.)

On Reply, Chartwell submitted new evidence of Defendants' alleged misappropriation.  While still employed with Chartwell, Kidan created a folder in his work email account entitled "EMPIRE," which contained multiple emails from Defendants Diaz and Alanis.  (Supp. Lilley Decl. ¶ 4, Doc. 31–4.)  On February 11, 2019, Diaz sent Kidan an email and attached two spreadsheets containing Chartwell's accounts receivable.  (*Id.*; *see* Exhibit 15 to Supp. Lilley Decl., Doc. 31–5.)  The spreadsheets were generated from MOS and contain Chartwell's existing customer names, invoice amounts, and amounts to be paid by the customer.  (Oken Decl. ¶ 7, Doc. 31-1.)[6]  Kidan attests that Diaz sent him the spreadsheet so that he could "value the company for purposes of a proposed buy-out."  (Supp. Kidan Decl. ¶ 6, Doc. 35-1.)

Further, on February 18, 2019, Alanis sent Kidan an email and attached a spreadsheet titled "MASTER Template Breakout By Branches."  (Supp. Lilley Decl. ¶ 7; Exhibit 17 to Supp. Lilley Decl., Doc. 31–7.)  The spreadsheet contains a list of Chartwell's customers' names and, for each customer, identifies the Chartwell representative working with that customer, and the customer's net sales, gross margin, gross margin percentage, mark up percentage, hours worked, 2018 injuries, and yearly run rate.  (Supp. Lilley Decl. ¶ 7.)  Though this spreadsheet could not have been generated from MOS, with the exception of the injury information, all of the information contained in the report could be obtained from MOS.  (Oken Decl. ¶ 10.)  Perhaps most telling of its purpose, the spreadsheet contained margin notes relating to whether to "bring over" or "pursue" the customer.  (Exhibit 17 to Supp. Lilley Decl.)

---

[6] The EMPIRE folder contained another email from Diaz to Kidan attaching Diaz's Employment Agreements.  (Supp. Lilley Decl. ¶ 6; Exhibit 16 to Supp. Lilley Decl., Doc. 31-6.)

Case No.  8:19-cv-00642-JLS-JDE                              Date: May 20, 2019
Title: Chartwell Staffing Services Inc. v. Atlantic Solutions Group Inc., et al

Additionally, on February 25, 2019, Alanis sent Kidan and Diaz an email and attached a spreadsheet entitled "Branch Transitions." (Exhibit 18 to Supp. Lilley Decl., Doc. 31-8.) The spreadsheet listed employees of Chartwell by "1st Wave," "2nd Wave," and "Final Wave." (*Id.*) Defendants Alanis, Diaz, Benavides, Cornejo, Rebultan, and Gonzales are listed as part of the "1st Wave." (*Id.*) The following day, February 26, 2019, Alanis emailed Kidan and Diaz and attached a spreadsheet entitled "1st Week and 1st 30." (Exhibit 20 to Supp. Lilley Decl., Doc. 31-10.)[7] The email stated that "[p]art of the impact of being able to pull the people in the first wave is that it will cripple Chartwell and they won;t [sic] be able to fill the orders making it easier for us to persuade clients to come since they are not getting the service they once did and we have all those players with us." (*Id.*) The attached spreadsheet assigned individuals – including Defendants Gonzales, Benavides, and Rebultan – to Chartwell's customers and contained Chartwell's net sales and gross margins for each customer. (*Id.*) The spreadsheet includes a column titled "Date to Pull," which states "ASAP" or "3/15/2019." (*Id.*)[8]

Kidan attests that he did not take any of the information identified in the Supplemental Lilley Declaration to Empire. (Supp. Kidan Decl. ¶ 12.) Further, he claims that he instructed the employees who left Chartwell for Empire "not to take any information from Chartwell." (*Id.* ¶ 14.)

Since leaving Chartwell for Empire, Defendants have solicited Chartwell's customers and employees. On March 18, 2019, Defendants Benavides and Cornejo visited Revolve Clothing, a customer of Chartwell's. (Cabrera Decl. ¶ 2, Doc. 18-4.) Cornejo told Chartwell's employees at Revolve that Revolve did not want to work with Chartwell anymore and that to continue working at Revolve, Chartwell's employees would have to fill out an employment application for Empire. (*Id.*) That same day, Defendant Gonzales visited Chartwell's customer Caplugs, and told one of Chartwell's

---

[7] Also on February 26, 2019, Alanis sent Kidan and Diaz an email and attached a spreadsheet containing Plaintiff's 2018 net sales and gross margins for each of Plaintiff's branches in Southern California. (Exhibit 19 to Supp. Lilley Decl., Doc. 31-9.)

[8] Further, on March 4, 2019, Alanis emailed Kidan and Diaz with a "To Do List," that listed tasks associated with Empire to Alanis, Kidan, and Diaz. (Exhibit 21 to Supp. Lilley Decl., Doc. 31-11.)

Case No.  8:19-cv-00642-JLS-JDE                    Date: May 20, 2019
Title: Chartwell Staffing Services Inc. v. Atlantic Solutions Group Inc., et al

employees that Chartwell had "split up" and that "the new company was Empire." (Temblador Decl. ¶ 3, Doc. 18-6.)  On March 19, 2019, Cornejo visited another customer of Chartwell's, Granitize, and told Chartwell's employees that Chartwell was "going under" and that if they wanted to keep their jobs at Granitize, they needed to fill out employment applications for Empire.  (Perez Decl. ¶ 2, Doc. 18-1.)  On March 20, 2019, Cornejo returned to Granitize with Rebultan and Alanis and informed Chartwell's employees that Chartwell was "doing bad" and would "very soon be out of business." (*Id.* ¶ 3.)  On March 27, 2019, Chartwell learned that its customer Cal-Western Manufacturers was placing job orders with Empire.  (Lilley Decl. ¶ 35.)  The same day, Chartwell also learned its customer Stepstone had replaced 13 of Chartwell's employees. (Lilley Decl. ¶ 36.)  Finally, on March 29, 2019, Chartwell learned that Defendant Hanks had been soliciting business from Chartwell's client Aquamar.  (Lee Decl. ¶ 2, Doc. 18-8.)

## II.    **LEGAL STANDARD**

"A preliminary injunction is an extraordinary and drastic remedy."  *Munaf v. Geren*, 553 U.S. 674, 689 (2008) (internal quotations marks omitted).  "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."  *Univ. of Tex v. Camenisch*, 451 U.S. 390, 395 (1981).  A district court should issue a preliminary injunction only "upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  This requires the district court to make findings of fact and conclusions of law.  *See Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1157 (9th Cir. 2007); *see also Hicks v. Neal*, No. C 12-2207 SI (pr), 2012 WL 3791399, at *3 (N.D. Cal. Aug. 31, 2012) ("In other words, the movant has to demonstrate, not merely allege, his entitlement to a preliminary injunction. . . . [A]llegations that may be sufficient for pleading purposes simply are not enough to prove his entitlement to a preliminary injunction.").

"[T]he party seeking the injunction . . . bear[s] the burden of demonstrating the various factors justifying preliminary injunctive relief . . . ."  *Granny Good Foods, Inc. v. Bhd. of Teamsters*, 415 U.S. 423, 441 (1974).  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to

Case No.  8:19-cv-00642-JLS-JDE                    Date: May 20, 2019
Title: Chartwell Staffing Services Inc. v. Atlantic Solutions Group Inc., et al

suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. This "requires the plaintiff to make a showing on all four prongs." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

## III.  DISCUSSION

### A.  Likelihood of Success on the Merits

A party seeking a preliminary injunction must establish that it is "likely to succeed on the merits." *Winter*, 555 U.S. at 20.  Chartwell moves for a preliminary injunction on its DTSA and CUTSA claims.  (Mem. at 15.)  Under the DTSA and the CUTSA, a court may grant an injunction to prevent any "actual or threatened misappropriation."  *See* Cal. Civ. Code § 3426.2; 18 U.S.C. § 1836(b)(3)(A).

"To state a claim for misappropriation of trade secrets under CUTSA, a plaintiff must allege: (1) the existence and ownership of a trade secret, and (2) misappropriation of the trade secret." *Sun Distributing Co., LLC v. Corbett*, Case No. 18-cv-2231-BAS-BGS, 2018 WL 4951966, at *3 (S.D. Cal. Oct. 12, 2018).  "A claim for misappropriation under the Defend Trade Secrets Act ("DTSA") has substantially similar elements." *Id.* (citing 18 U.S.C. § 1836).

### i.  Existence and Ownership of Trade Secret

"Both the DTSA and CUTSA define a 'trade secret' as:

all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if-
(A) the owner thereof has taken reasonable measures to keep such information secret; and

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  8:19-cv-00642-JLS-JDE                              Date: May 20, 2019
Title: Chartwell Staffing Services Inc. v. Atlantic Solutions Group Inc., et al

> (B) the information derives independent economic value, actual or
> potential, from not being generally known to, and not being readily
> ascertainable through proper means by, another person who can
> obtain economic value from the disclosure or use of the
> information."

*Sun Distributing*, 2018 WL 4951966, at *3 (citing 18 U.S.C. § 1839(3); Cal. Civ. Code §
3426.1(d)).

"The Ninth Circuit has held that a customer list qualifies as a trade secret 'because
it allows a competitor . . . to direct its sales efforts to those potential customers that are
already' doing business with the plaintiff." *Extreme Reach, Inc. v. Spotgenie Partners,
LLC*, Case No. CV 13-07563-DMG (JCGx), 2013 WL 12081182, at *3 (C.D. Cal. Nov.
22, 2013) (citing *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 521 (9th Cir.
1993); *Hollingsworth Solderless Terminal Co. v. Turley*, 622 F.2d 1324, 1330 (9th Cir.
1980)). "The most important consideration is whether the information is readily
accessible to a reasonably diligent competitor." *Hollingsworth Solderless Terminal Co.*,
622 F.2d at 1332. "In the context of customer lists, the answer to the question of whether
the information is readily accessible 'is often inferred from evidence concerning whether
the information is available in public directories,' but even if the names are in public
directories 'those names may appear among the names of many other businesses which
may be neither actual nor even potential customers of the plaintiff. Hence, it may be
costly to parse from such a directory potentially profitable customers from entries not
worth pursuing.'" *Extreme Reach*, 2013 WL 12081182, at *3 (quoting *Hollingsworth
Solderless Terminal Co.*, 622 F.2d at 1332). "Thus, a customer list may be a trade secret
even if the 'general class' of customers is 'readily accessible' to others." *Id.* (quoting
*Hollingsworth Solderless Terminal Co.*, 622 F.2d at 1332–33.)

Here, the Court concludes that the information within the MOS and CRM
databases are likely protectable trade secrets under the DTSA and the CUTSA.  Chartwell
defines its trade secrets as:

> customer lists, including information relating to customers' business affairs,
> special staffing needs, preferred methods of doing business, methods of
> operation, key contact personnel, mark up rates, pay rates, and other

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  8:19-cv-00642-JLS-JDE                                        Date: May 20, 2019
Title: Chartwell Staffing Services Inc. v. Atlantic Solutions Group Inc., et al

> negotiated terms specific to each customer, job order specifications and the
> particular characteristics and requirements of persons generally hired by the
> customer, specific job listings, mailing lists, computer runoffs, financial
> and other information; employee information, including the names,
> addresses, telephone numbers, qualifications, education, accomplishments,
> experience, availability, resumes and other data regarding persons who
> have applied or been recruited for temporary or permanent employment.

(Lilley Decl. ¶ 5.)  As noted above, this information is stored in the CRM and MOS
databases.

Defendants first argue that Chartwell has failed to define its trade secrets.  (Opp. at
21.)  "A plaintiff need not 'spell out the details of the trade secret.'" *Autodesk, Inc. v.
ZWCAD Software Co.*, Case No. 5:14–cv–01409–EJD, 2015 WL 2265479, at *5 (N.D.
Cal. May 13, 2015).  Nevertheless, the plaintiff must "describe the subject matter of the
trade secret with sufficient particularity to separate it from matters of general knowledge
in the trade or of special knowledge of those persons who are skilled in the trade, and to
permit the defendant to ascertain at least the boundaries within which the secret lies."
*Pellerin v. Honeywell Int'l, Inc.*, 877 F. Supp. 2d 983, 988 (S.D. Cal. 2012).  Chartwell
has sufficiently defined its trade secrets.  Although Chartwell's definition of its trade
secrets is comprehensive, the trade secrets are essentially Chartwell's customer list and
the information that accompanies the list, such as the key contacts, mark up rates, and pay
rates of each customer, as well as information regarding Chartwell's employees.[9]  The
case upon which Defendants rely, *Pellerin*, is inapposite.  There, the plaintiff "simply
recite[d] the statutory definition of a trade secret."  *Pellerin*, 877 F. Supp. 2d at 988–89.
Further, though they did not address the precise issue of whether the trade secrets were
properly defined, other courts have found protectable trade secrets nearly identical to
those within Chartwell's definition.  *See, e.g.*, *Sun Distributing*, 2018 WL 4951966, at *3;
*Extreme Reach*, 2013 WL 12081182, at *1; *ReadyLink*, 126 Cal. App. 4th at 1017–18.

---

[9] The parties argue only about whether the customer list and related information are trade secrets.
However, for the reasons discussed herein, information about Plaintiff's employees within the
CRM and MOS databases are also protectable.  *See ReadyLink HealthCare v. Cotton*, 126 Cal.
App. 4th 1006, 1017–18 (2005) (finding that customer *and* employee information in staffing
agency's database protectable as a trade secret).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  8:19-cv-00642-JLS-JDE                                    Date: May 20, 2019
Title: Chartwell Staffing Services Inc. v. Atlantic Solutions Group Inc., et al

Further, Chartwell has shown that it has taken reasonable measures to keep the information in the MOS and CRM databases secret.  Employees must use a password to access the databases, their credentials are immediately deleted upon termination or resignation, and each employee must sign an Employment Agreement that prohibits the disclosure of information contained in MOS and CRM.  This is sufficient to establish that Chartwell took reasonable measures to keep the information secret.  *See Extreme Reach*, 2013 WL 12081182, at *4 ("Extreme Reach has established that it took reasonable steps to maintain the secrecy of its Customer List by password protecting it, making it available to only certain employees, and protecting it with a firewall."); *Sun Distributing*, 2018 WL 4951966, at *4 ("Plaintiff attests it has its 'employees sign employment agreements with provisions to maintain the confidentiality of Trade Secrets [and] has a security system designed to protect its proprietary, confidential, and trade secret information.'"); *Morlife, Inc. v. Perry*, 56 Cal. App. 4th 1514, 1523 (1997) (finding reasonable measures where customer list was stored on a computer with restricted access and company instructed employees to maintain confidentiality); *MAI Sys.*, 991 F.2d at 521 ("MAI took reasonable steps to insure the secrecy to this information as required by the UTSA. MAI required its employees to sign confidentiality agreements respecting its trade secrets, including the Customer Database.").  Defendants briefly argue that Chartwell does not protect its trade secrets because it gives its "office staff unfettered" access to them.  (Opp. at 26.)  However, as noted above, Chartwell's employees have anything but "unfettered access" to the information – they must use a password to access the databases and sign Employment Agreements prohibiting unauthorized disclosure of the information contained therein.[10]

Finally, Chartwell has shown that its trade secrets have independent economic value.  As noted above, the Ninth Circuit has concluded that customer databases have potential economic value.  *See MAI Sys.*, 991 F.2d at 521 (customer database has

---

[10] Defendants also argue that Chartwell "has left its supposed trade secrets in storage units *in the names of former employees* for weeks."  (Opp. at 26 (emphasis in original).)  As an initial matter, this vague claim is unsupported by any evidence.  Further, even if some of the trade secret information has been printed and stored in boxes, the employees are still bound by the Employment Agreements that prohibits the unauthorized disclosure of the information.

Case No.  8:19-cv-00642-JLS-JDE                    Date: May 20, 2019
Title: Chartwell Staffing Services Inc. v. Atlantic Solutions Group Inc., et al

"potential economic value because it allows a competitor . . . to direct its sales efforts to those potential customers").  Indeed, courts have found databases nearly identical to CRM and MOS to have independent economic value.  *See, e.g.*, *Sun Distributing*, 2018 WL 4951966, at *3; *Extreme Reach*, 2013 WL 12081182, at *4; *ReadyLink*, 126 Cal. App. 4th at 1017–18.  This is because the MOS and CRM databases "contain[] information concerning [Chartwell's] customers' rates and purchase history – non-public information that is not readily available to others."  *Extreme Reach*, 2013 WL 12081182, at *4.  "[B]illing rates, key contacts, specialized requirements and mark up rates, [are] sophisticated information and irrefutably of commercial value and not readily ascertainable to other competitors."  *Courtesy Temp. Serv., Inc. v. Camacho*, 222 Cal. App. 3d 1278, 1288 (1990); *see also ReadyLink*, 126 Cal. App. at 1018 (database contained "data and the information would enable a competitor to recruit away from ReadyLink nurses and employees under contract with ReadyLink").  This is the exact type of information contained within the CRM and MOS databases.[11]

Defendants argue that "customer lists alone are not trade secrets" and that Chartwell "blindly relies" on *Morlife*.  (Opp. at 23.)  Defendants cite *Pollara v. Radiant Logistics Inc.*, 2014 WL 12585781, at *7 (C.D. Cal. June 6, 2014), wherein the Court noted that "*Morlife* stands for the limited proposition that customer lists are entitled to protection under the CUTSA only if they include additional non-public customer data that gives the owner a competitive advantage in the relevant market."  Assuming without

---

[11] Chartwell further points to California Business & Professions Code § 16607(a) as evidence that its customer list is a protectable trade secret.  (Mem. at 20.)  Broadly, § 16607(a) provides that the "customer lists" of "employment agencies" are trade secrets.  Defendants dispute that Chartwell is an employment agency.  (Opp. at 22.)  However, even assuming § 16607(a) does not apply, the Court concludes that the detailed information contained in the MOS and CRM databases are likely trade secrets.  Thus, the Court need not decide whether Chartwell is further protected by § 16607(a).  *See ReadyLink*, 126 Cal. App. 4th at 1018, 1021–22 (finding § 16607(a) irrelevant when "misappropriation is premised not only on . . . customer lists, but also on misappropriation of numerous other items" from within database that included "lists of ReadyLink nurses, employees, and healthcare facility customers, compilations of compensation, employment preferences, contact information, nurse applications and tests, and ReadyLink's unique per diem program").

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No. 8:19-cv-00642-JLS-JDE                    Date: May 20, 2019
Title: Chartwell Staffing Services Inc. v. Atlantic Solutions Group Inc., et al

deciding that *Pollara* accurately interprets *MorLife*,[12] the databases at issue here contain non-public information that provides a competitive advantage. The detailed compilation of *all* Chartwell's customers, combined with specific information concerning each customer's "billing rates, key contacts, specialized requirements and mark up rates" are protectable trade secrets. *See Courtesy Temp.*, 222 Cal. App. 3d at 1288.

Moreover, that some Defendants developed relationships with some of Chartwell's customers *while working for Chartwell* does not make those customers' information ineligible for trade secret protection. In fact, *Morlife* held just the opposite: "There is no legitimate reason for characterizing differently the conduct of a former employee who uses customer information personally developed for the employer during the period of employment from the use of the very same information developed by a coworker who had no customer contact." 56 Cal. App. 4th at 1526. This is because "information developed by an employee concerning the employer's customers represents an investment of time and money *on the part of the employer*, justifying a grant of trade secret protection against exploitation by the former employee." *Id.* (emphasis in original).

Defendants also note that Customer Relation Services, Inc. ("CRS") went bankrupt in 2015 and that many CRS personnel came to Chartwell seeking jobs, and brought with them customers including Granitize, Caplugs, Cal-Western, Stepstone, and Aquamar. (Opp. at 10.) Defendants vaguely claim that "[m]ost of the people who formed Empire originally came from CRS," in an apparent attempt to suggest Empire employees learned of these customers outside of their relationship with Chartwell. (Kidan Decl. ¶ 7.) However, even assuming Defendants' unsubstantiated claim is true, the information in the CRM and MOS databases, developed by Chartwell's employees, are still protectable trade secrets.[13]

---

[12] *Pollara* itself "acknowledges that a list alone could constitute a trade secret if the identity of customers inherently established something unique about them." 2014 WL 12585781, at *6 n.4.

[13] Defendants vaguely allude to the fact that "CRS sued Chartwell in 2015 for misappropriating its trade secrets" and that Chartwell "denied that the business information and customer contacts at issue were trade secrets." (Opp. at 23.) However, the Court will not speculate about what information was at issue in another lawsuit between different parties. In any event, former CRS

**CIVIL MINUTES – GENERAL**

Case No.  8:19-cv-00642-JLS-JDE                              Date: May 20, 2019
Title: Chartwell Staffing Services Inc. v. Atlantic Solutions Group Inc., et al

Defendants also rely on *American Paper & Packaging Products, Inc. v. Kirgan* 183 Cal. App. 3d 1318 (1986) and *AMN Healthcare, Inc. v. Aya Healthcare Servs., Inc.*, 28 Cal. App. 5th 923 (2018) for the proposition that "in a highly-competitive industry, where customers use multiple providers, a customer list is not a trade secret."  (Opp. at 25.)  As the court in *Extreme Reach* noted, however, *American Paper* merely stands for the proposition that "the names and addresses of potential clients were not protectable trade secrets because such information was readily accessible to competitors."  2013 WL 12081182, at *4; *American Paper*, 183 Cal. App. 3d at 1326.  Here, just as in *Extreme Reach*, "the information at issue includes rate information and specific details on customers' purchasing histories that is not readily ascertainable by competitors." 2013 WL 12081182, at *4.  Further, "subsequent cases have declined to follow *American Paper*, which predates California's adoption of the UTSA."  *Id.*  (collecting cases).

*AMN* is also distinguishable.  There, a nurse-staffing agency, AMN, claimed that three employees had misappropriated its customer list and used it to solicit nurses to a competing agency, Aya.   *AMN*, 28 Cal. App. 5th at 943–44.  The court concluded that the misappropriation claim failed because "[t]he undisputed evidence shows each of these travel nurses already was known to Aya and was in its database, long before each individual defendant left AMN and went to work for Aya."  *AMN*, 28 Cal. App. 5th at 944.  Indeed, the nurses "had sought employment with [Aya] before each individual defendant left AMN and joined Aya."  *Id.*  Further, the court distinguished the information at issue in *AMN* – the mere identity and contact information of nurses, which was in already in Aya's possession and available on a social media site – from *ReadyLink*, 126 Cal. App. 4th at 1006, which involved a complex database with detailed financial information similar to that contained within MOS and CRM.  *AMN*, 28 Cal. App. 5th at 945–946.

Accordingly, the Court concludes that Chartwell has established that it owns protectable trade secrets.

_____

customers represent a small portion of the customers in the CRM and MOS database.  (*See* Supp. Lilley Decl. ¶ 8 (attesting that of the 380 customers on the spreadsheet Alanis emailed to Kidan, only 23% of them were former CRS clients)).

_____

_____

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  8:19-cv-00642-JLS-JDE                              Date: May 20, 2019
Title: Chartwell Staffing Services Inc. v. Atlantic Solutions Group Inc., et al

  **ii.**   **Misappropriation**

The CUTSA defines misappropriation as:

(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
(2) Disclosure or use of a trade secret of another without express or implied consent by a person who:
 (A) Used improper means to acquire knowledge of the trade secret; or
 (B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was:
  (i) Derived from or through a person who had utilized improper means to acquire it;
  (ii) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use;
  (iii) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
 (C) Before a material change of his or her position knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or by mistake.

Cal. Civ. Code § 3426.1(b).  "Misappropriation under the DTSA is nearly identical." *Sun Distributing*, 2018 WL 4951966, at *5 (citing 18 U.S.C § 1839(5)).  "Acquisition of a trade secret by improper means includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means."  *DVD Copy Control Ass'n, Inc. v. Bunner*, 31 Cal. 4th 864, 875 (2003) (internal alterations removed) (quoting Cal. Civ. Code § 3426.1); *see also* 18 U.S.C. § 1839(6) (defining "improper means" in nearly identical manner).  "[M]isappropriation and misuse can rarely be proved by convincing direct evidence.  In most cases plaintiffs must construct a web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences . . . that it is more probable than not that what plaintiffs allege happened did in fact take place."  *UniRAM Tech., Inc. v. Taiwan Semiconductor Mfg. Co.*, No. C-04-1268 VRW, 2007 WL 2572225, at *5 (N.D. Cal. Sept. 5, 2007); *see also Droeger v. Welsh Sporting Goods Corp.*, 541 F.2d 790, 792 (9th Cir. 1976).

Case No.  8:19-cv-00642-JLS-JDE                                    Date: May 20, 2019
Title: Chartwell Staffing Services Inc. v. Atlantic Solutions Group Inc., et al

As noted above, Chartwell's original theory of misappropriation was that Diaz accessed and downloaded information from MOS and CRM on March 6, 2019.  On reply, however, Chartwell submitted extensive evidence that, before they left Chartwell for Empire, Diaz and Alanis emailed to Kidan detailed spreadsheets, one of which was directly downloaded from MOS and others that contained information stored in MOS. Further, Alanis stated in an email to Kidan, to which he attached a spreadsheet identifying Chartwell's customers, their net sales, and gross margins, that the ability to take Chartwell's customers and employees would "cripple" Chartwell.  (*See* Exhibit 20 to Supp. Lilley Decl.)  All this information was stored in a folder titled "EMPIRE," making explicit Kidan's intention to use the information contained therein at his new company.

While Defendants have presented credible declarations refuting, at least in part, Chartwell's original misappropriation theory,[14] their defense of the emails supporting Chartwell's Reply is lackluster.  Essentially, they argue that Chartwell should have found the damning emails sooner.  (Sur-Reply at 1.)  Even assuming Defendants are correct and that the emails were in a "readily accessible email folder," this does nothing to refute the fact that Defendants emailed to one another Chartwell's confidential trade secret information, and had the stated intent to use the information to "cripple" Chartwell's business.

Further, Defendants argue that Chartwell has not presented evidence that Defendants have used, or threatened to use, trade secret information.  (Opp. at 18; Sur-Reply at 3.)  Instead, Defendants argue that Chartwell has merely shown that Defendants solicited some of Chartwell's customers.  (Opp. at 18.)  Defendants argue that they contacted Chartwell's customers based on prior relationships with the customers, and that they have not used any trade secret information in doing so.  (*Id.* at 19.)

To be sure, as Defendants note, "[i]t is not the solicitation of the former employer's customers, but is instead the misuse of trade secret information, that may be enjoined." *The Ret. Grp. v. Galante*, 176 Cal. App. 4th 1226, 1237–38 (2009) (emphasis removed).  However, as noted above, misappropriation and misuse "can rarely be proven

---

[14] The Dallas Declaration states that Diaz sent a customer insurance information from MOS and CRM at 6:03 p.m.  (*See* Dallas Decl. ¶ 7.)  However, Chartwell's evidence shows that Diaz logged into CRM and MOS at 7:59 p.m. and 8:00 p.m., respectively.  (Guay Decl. ¶ 8.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  8:19-cv-00642-JLS-JDE                                        Date: May 20, 2019
Title: Chartwell Staffing Services Inc. v. Atlantic Solutions Group Inc., et al

by convincing direct evidence." *UniRAM Tech.*, 2007 WL 2572225, at *5; *see also Morlife*, 56 Cal. App. 4th at 1527 ("Appellants argue that solicitation could only be established by direct evidence on a customer-by-customer basis, and respondent failed to present evidence that direct solicitations occurred as to all affected Morlife customers. Such an assertion is unfounded in either law or logic.")  Here, Chartwell has presented direct evidence that Defendants Kidan, Alanis, and Diaz downloaded and compiled into spreadsheets Chartwell's trade secrets from the MOS and CRM databases.  Indeed, one of the spreadsheets divides Chartwell's customers and employees into those that Empire would seek to "pull" "ASAP" and those it would "pull" on March 5, 2019; the rows contain Chartwell's net sales, gross margins, and "sick pay" for each customer.  (Exhibit 20 to Supp. Lilley Decl.)  The spreadsheet includes Cal-Western and Stepstone, two of the customers Chartwell claims Defendants have solicited.  (*Id.*)  Further, the email states that taking Chartwell's employees, along with its customers, will make it easier for Empire to "persuade clients" to leave Chartwell for Empire.  (*Id.*)

Thus, Chartwell has shown that Alanis and Diaz sent spreadsheets containing Chartwell's trade secrets to Kidan for the express purpose of bringing those customers and employees to Empire.  This, standing alone, is enough to show that Defendants have threatened to use Chartwell's confidential trade secret information.  *See Sun Distributing*, 2013 WL 4951966, at *6 (finding misappropriation based on "only one email" discussing rates and distribution plans).  Indeed, it is hard to imagine an innocent explanation as to why Chartwell's confidential information was in a folder titled "EMPIRE"; the most obvious explanation is that Defendants intended to use such information at Empire to poach Chartwell's customers and employees.  Moreover, Chartwell has shown that Defendants likely *have* used the trade secret information by soliciting Plaintiff's customers and employees.  It is more likely than not that Defendants used Chartwell's confidential information to decide which customers and employees to pursue.

Accordingly, the Court concludes that Chartwell has shown that Defendants likely misappropriated its trade secrets.  Thus, the Court concludes that Chartwell has shown a likelihood of success on the merits.

_____
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  8:19-cv-00642-JLS-JDE                    Date: May 20, 2019
Title: Chartwell Staffing Services Inc. v. Atlantic Solutions Group Inc., et al

### B.        Irreparable Harm

A party seeking a preliminary injunction must establish that he is "likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20. "Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages." *Arizona Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014) (citing *Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991)).  "[I]ntangible injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm." *Rent–A–Center*, 944 F.2d at 603.  "Evidence of threatened loss of prospective customers supports a finding of irreparable harm." *Extreme Reach*, 2013 WL 12081182, at *7 (citing *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001); *Super-Krete Int'l, Inc. v. Sadleir*, 712 F. Supp. 2d 1023, 1037 (C.D. Cal. 2010)). Indeed, "an intention to make imminent or continued use of a trade secret or to disclose it to a competitor will almost always certainly show irreparable harm." *Sun Distributing*, 2018 WL 4951966, at *7 (quoting *Pac. Aerospace & Elec., Inc. v. Taylor*, 295 F. Supp. 2d 1188, 1198 (E.D. Wash. 2003)).

Here, Chartwell has established that Defendants downloaded Chartwell's trade secret information before they resigned for the express purpose of poaching Chartwell's customers and have since solicited five of Chartwell's customers.  Thus, Chartwell has shown that it stands to lose customers and goodwill if an injunction is not issued. Defendants argue that because Chartwell is a "massive, national company with revenue in the hundreds of millions of dollars . . . [t]he loss of one or a handful of customers is a drop in the bucket."  (Opp. at 28.)  Defendants miss the point – loss of customers and goodwill through misappropriation of trade secrets is axiomatic irreparable harm. Further, though Defendants have thus far attempted to solicit business only from five of Chartwell's customers, the trade secret information misappropriated by Defendants contains information on *thousands* of Chartwell's customers.  (*See, e.g.*, Exhibit 15 to Lilley Decl.)

Accordingly, the Court concludes that Chartwell has shown that it will be irreparably harmed in the absence of preliminary relief.

### C.      Balance of Equities

A party seeking a preliminary injunction must establish that "the balance of equities tips in his favor." *Winter*, 555 U.S. at 20.  In assessing this prong, a court must "balance the interests of all parties and weigh the damage to each." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009) (quoting *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1203 (9th Cir. 1980)).

Here, as noted above, the damage to Chartwell is the loss of customers and goodwill.  Defendants argue that they will be harmed by an injunction because, if they are enjoined from "contacting" Chartwell's customers, they will go out of business. (Opp. at 29.)  Defendants provide no evidence supporting this assertion.  Moreover, Defendants' misappropriation of Chartwell's trade secrets "justifies application of the injunction to any [of Chartwell's customers] about which appellants acquired information while they were in [Chartwell's] employment." *Morlife*, 56 Cal. App. 4th at 1528; *see ReadyLink*, 126 Cal. App. at 1026 (affirming injunction prohibiting solicitation of employees and customer in database).  "While California courts have shown a reluctance to impose an unconditional prohibition on doing business with customers of the former employer, they have prohibited the unlawful use of trade secrets to solicit those customers." *Morlife*, 56 Cal. App. 4th at 1524.  Thus, even if an injunction here would prohibit Defendants from soliciting "a large segment of the potential universe of customers," the balance of equities still weighs in Chartwell's favor.  *See Extreme Reach*, 2013 WL 12081182, at *8.  Moreover, an injunction would have "no impact on any future legitimate sales efforts *not* based on misappropriation of protected trade secrets." *See id.* at *9 (emphasis in original); *see also Morlife*, 56 Cal. App. 4th at 1528 (noting that defendant was "free to solicit customers whose identities are not the trade secrets of Morlife").

Accordingly, this prong weighs in favor of the issuance of a preliminary injunction.

Case No.  8:19-cv-00642-JLS-JDE                    Date: May 20, 2019
Title: Chartwell Staffing Services Inc. v. Atlantic Solutions Group Inc., et al

### D.      Public Interest

A party seeking a preliminary injunction must establish that "an injunction is in the public interest." *Winter*, 555 U.S. at 20.  The party seeking the injunction bears the initial burden of showing that the injunction is in the public interest.  *Stormans*, 586 F.3d at 1139.  However, a court need not consider public consequences that are "highly speculative." *Id.*  In other words, a court should weigh the public interest in light of the "*likely* consequences of the injunction." *Id.*

"Protection of trade secrets benefits the public interest." *Extreme Reach*, 2013 WL 12081182, at *9 (citing *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 483 (1974) ("[I]t is hard to see how the public would be benefited by disclosure of customer lists.... in fact, keeping such items secret encourages businesses to initiate new and individualized plans of operation, and constructive competition results.")).

Accordingly, this prong weighs in favor of the issuance of a preliminary injunction.

### E.      Bond

Federal Rule of Civil Procedure 65(c) permits a court to grant preliminary injunctive relief "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  "Despite the seemingly mandatory language, Rule 65(c) invests the district court 'with discretion as to the amount of security required, *if any*.'"  *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (emphasis in original).  "The burden of establishing the amount of bond necessary to secure against the wrongful issuance of an injunction rests with the defendant." *Extreme Reach*, 2013 WL 12081182, at *9–10.

Here, Defendants present *no evidence* establishing any specific costs or damages that they would sustain as a result of an injunction.[15]  Defendants' vague statement in

---

[15] Defendants waited until the end of oral argument to request that they be allowed to present evidence regarding an appropriate bond after the issuance of any injunction.  However,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  8:19-cv-00642-JLS-JDE                    Date: May 20, 2019
Title: Chartwell Staffing Services Inc. v. Atlantic Solutions Group Inc., et al

their Opposition, with no evidentiary support, that an injunction will cause them to go out of business, is "speculative at best." (Opp. at 16)  *See Extreme Reach*, 2013 WL 12081182, at \*10.  Accordingly, the Court declines to order a security bond in connection with the injunction.

## IV. CONCLUSION

Because all four prongs weigh in favor of the issuance of a preliminary injunction, the Court ORDERS as follows:

1.  The Court hereby preliminary ENJOINS Defendants their agents, employees, representatives, and those acting in concert from:

    a.  Any further use or disclosure of Chartwell's Confidential Trade Secret Information, defined as information from Chartwell's Customer Relationship Management ("CRM") and Madison Online Solutions ("MOS") databases, consisting of

        i.  Chartwell's proprietary client list, including information contained therein relating to the clients and their business affairs, special staffing needs, preferred methods of doing business, methods of operation, key contact personnel, and mark up rates and other negotiated terms specific to each customer;

        ii.  names, addresses, telephone numbers, qualifications, education, accomplishments, experience, availability, resumes and other data regarding persons who have applied or have been recruited for temporary or permanent employment with Chartwell; and

        iii.  job order specifications, including particular characteristics and requirements of persons generally hired by a client, specific job listings, mailing lists, computer runoffs, pay rates and other financial information;

---

Defendants were aware of this issue, having raised it in their Opposition, and had every opportunity to properly present evidence prior to the hearing.  Further, "[t]he preliminary injunction merely enjoins them from using [Chartwell's] confidential customer list information, which they have no right to use in any event."  *See Extreme Reach*, 2013 WL 12081182, at \*9.

Case No.  8:19-cv-00642-JLS-JDE                                    Date: May 20, 2019
Title: Chartwell Staffing Services Inc. v. Atlantic Solutions Group Inc., et al

    b.  Soliciting any of Chartwell's customers or employees whose information is contained in the Confidential Trade Secret Information;

    c.  Performing services for any already-solicited customers whose information is contained in the Confidential Trade Secret Information.

2. This Preliminary Injunction shall take effect immediately and shall remain in effect pending resolution of the merits of this case or further order of this Court.

Initials of Preparer:  tg