**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION AT SANTA ANA**

**HONORABLE JOSEPHINE L. STATON, JUDGE PRESIDING**

**CERTIFIED TRANSCRIPT**

```
CHARTWELL STAFFING SERVICES,      )
INC.,                             )
                                  )
            PLAINTIFF,            )
                                  )
       vs.                        ) SACV NO. 19-00642-JLS
                                  )
ATLANTIC SOLUTIONS GROUP, INC.,   )
et al.,                           )
                                  )
            DEFENDANTS.           )
_____)
```

REPORTER'S TRANSCRIPT OF PROCEEDINGS

SANTA ANA, CALIFORNIA

FRIDAY, MAY 17, 2019

10:29 A.M.

**DEBORAH D. PARKER, CSR 10342**
**OFFICIAL COURT REPORTER**
**UNITED STATES DISTRICT COURT**
**411 WEST FOURTH STREET**
**SUITE 1-053**
**SANTA ANA, CALIFORNIA 92701**
**(657) 229-4305**
**transcripts@ddparker.com**

APPEARANCES OF COUNSEL:

        FOR THE PLAINTIFF, CHARTWELL STAFFING SERVICES,
        INC.:

                                AILEEN HUNTER
                                BRYAN CAVE, LLP
                                3161 MICHELSON DRIVE
                                SUITE 1500
                                IRVINE, CALIFORNIA 92612
                                (949) 223-7138
                                aileen.hunter@bclplaw.com

                                TRACI CHOI
                                BRYAN CAVE, LLP
                                3161 MICHELSON DRIVE
                                SUITE 1500
                                IRVINE, CALIFORNIA 92612
                                (949) 223-7169
                                traci.choi@bclplaw.com

        FOR THE DEFENDANTS, ATLANTIC SOLUTIONS GROUP,
        INC., ET AL.:

                                DAMION ROBINSON
                                AFFELD GRIVAKES LLP
                                2049 CENTURY PARK EAST
                                SUITE 2460
                                LOS ANGELES, CALIFORNIA 90067
                                (310) 979-8700
                                dr@agzlaw.com

                                DAVID W. AFFELD
                                AFFELD GRIVAKES LLP
                                2049 CENTURY PARK EAST
                                SUITE 2460
                                LOS ANGELES, CALIFORNIA 90067
                                (310) 979-8700
                                dwa@agzlaw.com

1    **SANTA ANA, CALIFORNIA; FRIDAY, MAY 17, 2019; 10:29 A.M.**

2         THE CLERK:  Calling Calendar Item No. 3,

3    SACV 19-00642-JSL, Chartwell Staffing Services versus

4    Atlantic Solutions Group, Inc., et al.

5         Counsel, your appearances, please, for the record.

6         MS. HUNTER:  Good morning, Your Honor.

7         Aileen Hunter for the plaintiff, Chartwell

8    Staffing Services, Inc.

9         THE COURT:  Good morning.

10:29:03  10         MS. CHOI:  Good morning, Your Honor.

11         Traci Choi, appearing for plaintiff, Chartwell

12    Staffing Services, Inc.

13         THE COURT:  Good morning.

14         MR. ROBINSON:  Good morning, Your Honor.

10:29:11  15         Damion Robinson for defendants Atlantic Solutions

16    Group, Inc., and the individual defendants.

17         MR. AFFELD:  Good morning, Your Honor.

18         David Affeld, also for Atlantic and the individual

19    defendants.

10:29:23  20         THE COURT:  All right.  Good morning to all of

21    you.

22         We're here on the order to show cause re:

23    preliminary injunction.  I have reviewed all the papers, and

24    I'm pulling them up, as we speak, if I can get them to come

10:29:37  25    up.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

4

10:29:48   1            All right.  And the Court has received and

2      reviewed the transcripts that were filed along with all of

3      the declarations.  I believe I have all of the evidence in

4      front of me, so I will hear argument this morning.

10:30:06   5      Presumably, I gave you a full opportunity on the papers, so

6      I'm not going give you too much time this morning.  But to

7      the extent you need it, I'll give each side about 10 minutes

8      or so.

9            So since this is plaintiff's motion for

10:30:22   10      preliminary junction, I'll allow you to be heard first, if

11      you would like to step over to the lectern with whatever

12      materials you have.

13            MS. HUNTER:  Thank you, Your Honor.

14            Your Honor, we believe the most critical evidence

10:30:37   15      are Exhibits 15, 17 and 20.

16            THE COURT:  That were attached to the supplemental

17      declaration filed with your reply brief?

18            MS. HUNTER:  Yes, Your Honor, to the declaration

19      of Mr. Holmes Lilley, which were also filed under seal by

10:30:50   20      Your Honor.

21            If you take a close look at Exhibit 17, it's very

22      compelling and tells the story of what exactly happened

23      here, which was that in February before these employees left

24      Chartwell, they began scheming to form a company called

10:31:09   25      Empire and took confidential and proprietary trade secret

*DEBORAH D. PARKER, U.S. COURT REPORTER*

10:31:15  1    information that was stored in both the MOS and CRM

2    databases of Chartwell that was both password protected and

3    also the information was segmented by the employee's job

4    duties.

10:31:27  5         So Mr. Alanis attaches this spreadsheet, sends it

6    to both Mr. Kidan and Ms. Diaz, to their personal e-mail

7    addresses.  And if you look at the data on there, this is

8    exactly the sort of secret sauce that is entitled to trade

9    secret protection, not only under 16607 but under federal

10:31:51 10   and state statutes.  Specifically, Exhibit 17 has the markup

11   rate for the particular clients per branch location in

12   Southern California, and the market rate is what is critical

13   to a staffing industry to make its money.  It's one of the

14   main components is how much above the employee's hourly rate

10:32:12 15   are they able to mark that up.  And that's what this

16   staffing agency gets paid on.  Even half a point difference

17   in that is massive, especially on a big national client.

18   The other information that's contained on this spreadsheet

19   is the gross margin per branch location and customer, and it

10:32:32 20   also has the aging so the -- essentially, the -- the amount

21   of time that the bill is overdue for.

22        THE COURT:  The financial strength of the client

23   will be indicated in aging.

24        MS. HUNTER:  Exactly, Your Honor.

10:32:48 25        And you can see the notations there.  For the ones

10:32:49   1   that have a high aging amount, it says "Do not pursue."  Or

2   a notation where the particular client is, quote, in legal,

3   they've made notations to not pursue that as well.

4          So this is the blueprint of which are the most

10:33:03   5   profitable clients, how they're going to take them, what the

6   branch locations are.  They even have the salary details of

7   the branch manager.  This is, essentially, what these laws

8   were designed to prohibit, is to prohibit people from taking

9   information and then using it to start a competing business,

10:33:21 10   directing their sales efforts towards these customers.

11          And on the first page, you can actually see one of

12   the customers, we have evidence, they've already gone to

13   location of and taken the customer, and that is on page 1--

14   I'm sorry.  Page 2 of Exhibit 17, you'll see Stepstone is on

10:33:38 15   there and it shows it's a very profitable customer.  And

16   then on page -- the following page, which is page 3 of the

17   exhibit, the very top, you see Cal-Western.  There's no

18   evidence in any of their declarations that any of these

19   defendants had a preexisting relationship with them or had

10:33:55 20   any knowledge about these customers that they learned

21   outside of their business operations for Chartwell.

22          The other thing I anticipate they may say in

23   response to this, Your Honor, is that there's no evidence

24   this went outside the company.  But they're using their

10:34:14 25   personal e-mail addresses and the content of the e-mails

10:34:18  1  that Mr. Alanis has submitted and authenticated through his

2  own declarations.  He admits to sending these, and he's

3  laying out the strategy of what wave they're going to take

4  not only with these customers but the internal employees.

10:34:41  5       And, additionally, Your Honor, the fact that

6  they -- even though they were still employed at Chartwell

7  when they did this doesn't mean that it's not a

8  misappropriation.  They had access to these databases for

9  the limited purposes of performing --

10:34:54  10       THE COURT:  Is there an argument that because they

11  are still at Chartwell that this was not misappropriation?

12       MS. HUNTER:  I anticipate that's coming.

13       THE COURT:  Well, ignore that then.

14       MS. HUNTER:  Okay.  Okay.  Thank you, Your Honor.

10:35:03  15       So at a minimum, we believe that Exhibits 15, 17

16  and 20 show actual misappropriation of Chartwell's trade

17  secret information and, certainly, there's a threat that

18  they're going to continue to misuse this, because they have

19  directed their efforts to a number of the customers that are

10:35:22  20  on this list that we know about.

21       THE COURT:  All right.  I'm going to have you take

22  a seat.

23       MS. HUNTER:  Thank you, Your Honor.

24       THE COURT:  Let me hear from defendant.

10:35:31  25       Counsel.

8

10:35:32    1          MR. ROBINSON:  Thank you, Your Honor.

            2          I want to focus where Counsel left off, which is

            3   with these three exhibits that have turned into the center

            4   point for this motion.  And stepping back --

10:35:44    5          THE COURT:  Along with the e-mail that talks about

            6   crippling Chartwell, along with the -- the e-mail contents

            7   that talk about taking employees in waves, yes.

            8          MR. ROBINSON:  So Exhibit 20, that's the exhibit

            9   that Your Honor is referring to with the cover e-mail,

10:36:02   10   Exhibit 20 is a list of individuals who are employees now of

           11   Empire.  It's a book of business.  It's not a list of

           12   multiple clients.  It's a one-page list that says, *Here are*

           13   *our reps that are coming with us and here are their clients.*

           14          It would be no different than a lawyer who's

10:36:22   15   thinking about switching law firms, looking up his or her

           16   list of clients and saying, *Here's who might follow me to a*

           17   *new law firm.*

           18          The employees, including Mr. Alanis, and --

           19   Mr. Alanis, primarily, had personal relationships, direct

10:36:41   20   dealings with the customers.  The plaintiffs have identified

           21   five total customers.  Mr. Alanis, as the regional manager,

           22   dealt directly with each of those customers.

           23          THE COURT:  And so you're saying because he dealt

           24   directly with them, he's entitled to solicit them with

10:36:57   25   whatever information Chartwell has about them.

10:36:59   1           MR. ROBINSON:  No, Your Honor.  But the gap that

2      we have here is that there is no evidence in the record,

3      whatsoever, that anyone used any of the information that

4      Chartwell has identified to solicit --

10:37:10   5           THE COURT:  In a case like this, evidence is

6      almost always circumstantial.  And, quite frankly, they have

7      much more of a smoking gun than would typically be seen in

8      cases like this, so I'm not -- I'm not understanding what

9      you think other than getting an e-mail saying, *The documents*

10:37:29  10   *that we have that show who we're going to pursue, let's*

11     *pursue them.  You go over to their business tomorrow and try*

12     *to steal it away from Chartwell.*

13          Short of that e-mail, what kind of evidence do --

14     do you think one would find?

10:37:47  15          I mean, this particular document, Exhibit 17, that

16     has notes in the margins about what essentially takes the

17     trade secret information and then says, based on that, this

18     is who we are going to pursue or not pursue, all of this put

19     together weaves a very clear picture of misappropriation of

10:38:08  20   trade secrets.

21          MR. ROBINSON:  Your Honor, the Exhibit 17 that

22     you're referring to with the margin notes, if you look at

23     the list and you look at the evidence of what's actually

24     happened, they're a minor overlap of customers between that

10:38:23  25   list and the customers that plaintiff has identified as

10:38:26  1    being solicited, so it's not --

2              THE COURT:  But how do -- but -- so you have to

3    start somewhere, right, when you're soliciting customers?

4              So what you're saying is:  They only use this to

10:38:39  5    solicit a few customers?  They didn't get a chance to

6    solicit the others they had listed here?

7              I'm not sure what -- it matters that the overlap

8    is somewhat small.

9              MR. ROBINSON:  Your Honor, the point -- the point

10:38:51 10    I'm making is, is that the customers were customers who had

11   direct business relationships with these individuals.  We

12   took the deposition of Patrick McKenney, and he says, *It's*

13   *customary in this industry, if I have customers that I deal*

14   *with as a rep, if I leave and go somewhere else, those*

10:39:08 15   *customers follow me.*

16             THE COURT:  Right.  So they could.  If you

17   didn't -- but what you can't do is use information that's

18   trade secret information to go solicit them.

19             MR. ROBINSON:  And, Your Honor, there has been no

10:39:21 20   evidence submitted of any use of the information.  We

21   started out --

22             THE COURT:  This is evidence.

23             MR. ROBINSON:  Evidence of --

24             THE COURT:  Exhibit 17 is evidence.

10:39:31 25             MR. ROBINSON:  Evidence that bears --

*DEBORAH D. PARKER, U.S. COURT REPORTER*

10:39:31  1          THE COURT:  What was it that was found in a file

2    labeled "Empire"?

3          MR. ROBINSON:  The e-mails were found in a file

4    that Adam Kidan created on his e-mail and left at Chartwell,

10:39:44  5    did not delete and left in place of [sic] Chartwell called

6    "Empire."

7          He knew that Chartwell was going to find it.  He

8    wanted to avoid even an appearance that he was misusing it.

9          THE COURT:  I don't think he knew that Chartwell

10:39:53 10    was going to find it.  I think that -- I mean, the idea that

11    he did this and knew they were going to find it and --

12          MR. ROBINSON:  He left it in his e-mail box when

13    he left the company.  He left his computer there and invited

14    them to search it and look through all of his things and see

10:40:13 15    if there was anything that Chartwell wanted to keep.

16          THE COURT:  Okay.  I guess they did.

17          MR. ROBINSON:  They -- the final point on this,

18    Your Honor, that is -- we've received -- there's no link

19    between the information that they have started out with and

10:40:32 20    the theory of trade secrets that they've started out with

21    and where we are now.

22          THE COURT:  That's because it clearly did evolve

23    as they found more things.  The thing -- the reason that the

24    Court didn't grant a TRO was that -- was simply because I

10:40:48 25    thought that they had enough information that if this were

*DEBORAH D. PARKER, U.S. COURT REPORTER*

10:40:52  1   the kind of motion that needed to be granted overnight, they

2   should have raced in here much sooner.  You don't wait

3   months and then say, *Issue this tomorrow.*

4          So I gave you the opportunity to respond, but in

10:41:06  5   doing that, it's often the case that additional information

6   is uncovered.  I imagine throughout the course of this

7   action additional information may be uncovered.  But I don't

8   ignore it simply because it was covered [sic] a little bit

9   later.

10:41:19  10         I don't think their theory changed at all.  It's

11  just the evidence that they found to support it changed.  I

12  know originally it was the individual who had downloaded

13  documentation while she was on some sort of leave or away

14  from the -- the business and then she left the company like

10:41:41  15  within a day or so after that.  And so now you have a client

16  that says, *Yeah, we asked her for some information and she*

17  *says that's why I download* [sic]*.  That's why I accessed the*

18  *system.*

19         So, you know, clearly, at least as to that client

10:42:02  20  receiving that information, they -- the client can support

21  that.  But I don't see the -- I don't see the, really,

22  response to all of this other evidence that's come in.

23         MR. ROBINSON:  So the --

24         THE COURT:  How do you respond to the one that

10:42:20  25  says, *We're taking these employees in waves and that will*

10:42:25  1   *cripple the company?*  It seems to be part of a totality of

2   evidence that shows they were trying to benefit by --

3       Perhaps that just breaches a fiduciary duty, which

4   is not necessarily the support for the preliminary

10:42:42  5   injunction.  That will come later, perhaps, with Mr. Kidan.

6   But it looks like it's part of an overall picture of trying

7   to use or benefit from the -- you know, from Chartwell and

8   from the information and knowledge of its employees and

9   trying to affirmatively damage it.

10:43:05  10      MR. ROBINSON:  Your Honor, the e-mails sent are

11   identifying people who are leaving to join Empire.

12       THE COURT:  No, I'm talking specifically.  Please,

13   correct me if I am wrong, because I thought I recalled an

14   e-mail that identified taking employees in waves and talked

10:43:22  15   about how if we structure it in a certain way, Chartwell

16   won't have a chance to respond and that will cripple them.

17   The customers will come to us because of the manner in which

18   we've taken the employees in these waves.

19       Am I misremembering that there wasn't such an

10:43:40  20   e-mail?

21       MR. ROBINSON:  So Exhibit 20, and -- there's no

22   argument that the language in Exhibit 20 is inflammatory.

23   But what Exhibit 20 actually represents is a list of reps

24   who were leaving Chartwell to join Empire and their

10:43:58  25   customers.

10:43:58   1          THE COURT:  I think the document speaks for

2    itself.  It's one of those *res ipsa loquitur* things.

3          MR. ROBINSON:  I want to circle back, briefly, to

4    the point I was earlier, which is the changing theory.  The

10:44:09   5    theory at the beginning of this was:  Jamie Diaz accessed

6    our customer list.  Got customer contact information.

7    Transmitted it to Empire and now Empire is using that

8    contact information to contact our customers.

9          The second wave of documents are, *Well,*

10:44:24  10    *Chartwell -- Empire has taken our financial information and*

11    *somehow using it to do something that's unclear.*

12          THE COURT:  No, I don't think they're saying

13    "somehow using it to do something that's unclear."

14          I think they say, you're taking their customer

10:44:41  15    lists that have key information about the financials for

16    each customer.  You're prioritizing, soliciting those

17    customers, based on the strength of the financial

18    information and based on your ability to use that

19    information to compete with them by using their markup

10:44:59  20    rates, their gross margins, aging lists and you're

21    identifying which employees -- your client is identifying

22    which customers it plans to go after, based on the

23    information in there.

24          I don't think it's vague that they're saying that

10:45:15  25    somehow they're using some documents in some unidentified

10:45:19   1    way.  I understand them to be saying what I just said.

2          MR. ROBINSON:  And, Your Honor, that may be a

3    theory, but it's not a theory for which they've submitted

4    any evidence.  Meaning, if we were going after customers

10:45:32   5    that have high margins, or high interest rates, or good

6    payment history, or something like that where there's some

7    connection between the financial information and the

8    customers that were being recruited, I can see that.  But

9    there is no such evidence.

10:45:46  10          There's three customers that had a preexisting

11    business relationship with Tony Alanis and with the reps

12    that followed Tony Alanis to Empire.  Those are the ones

13    that have been contacted.

14          So, I agree with, Your Honor.  If someone was

10:46:01  15    going down a list and saying, *Here are the most valuable*

16    *customers, here are the ones we can target in this way,* I

17    understand the point.

18          But you have access to the information.  You

19    contact your own customers.

10:46:13  20          THE COURT:  Well, respond to the argument that was

21    made that the customer at the top of page 3 on Exhibit 17,

22    whose name I don't remember right now, was not a customer

23    with whom there was prior contact.  What was the name of the

24    customer?

10:46:28  25          MS. HUNTER:  Stepstone, Your Honor.

16

10:46:31   1          THE COURT:  No.  I think it was Cal-Western.  I
        2   thought that was the one that you said.  Am I misstating?
        3          MS. HUNTER:  It's Cal-Western, Your Honor.
        4          THE COURT:  So who was the contact there?
10:46:46   5          MR. ROBINSON:  Tony Alanis was.  Tony Alanis was
        6   in charge of the branch.  Tony Alanis had direct contact --
        7          THE COURT:  Okay.  So I understand.  So what your
        8   argument is, is because he was in charge of the branch, any
        9   branch customer -- was it his specific client -- customer he
10:47:01  10   got commissions from them, or something along those lines?
       11          MR. ROBINSON:  I can verify that, Your Honor, but
       12   he had --
       13          THE COURT:  I'm not saying this makes a difference
       14   to me.  I don't think it does.  I'll look back at the rest
10:47:11  15   of the facts, but I at least want to know whether they had
       16   this ongoing*, Yes, I'm the one who services that account*
       17   *relationship.*
       18          MR. AFFELD:  Your Honor, what I'd suggest -- we
       19   can hear the direction Your Honor is leaning.  Maybe
10:47:25  20   Mr. Robinson can look for the pinpoint reference on that
       21   point about that particular customer.  And there's just a
       22   couple of points I would like to address.
       23          THE COURT:  I usually let one person speak.  I
       24   don't have bouncing back and forth argument between
10:47:39  25   attorneys.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

10:47:40  1          MR. AFFELD:  If you can make an exception, I just

2    have a couple quick points.

3               THE COURT:  Tell me why.  Is --

4               MR. AFFELD:  Just to use the time efficiently so

10:47:47  5    that Mr. Robinson can look up that particular customer and

6    respond.

7               THE COURT:  I don't need him to do that.  That's

8    fine.

9               MR. AFFELD:  These other points -- I know time is

10:47:56 10    short, and I promise I won't --

11               THE COURT:  All right.  Since you hear the

12    direction I'm going and it's likely to rule against you,

13    I'll give you the opportunity.

14               MR. AFFELD:  I appreciate that.

10:48:05 15               THE COURT:  Just a minute, though.

16               MR. AFFELD:  Okay.  So, first of all, the

17    deposition testimony, it starts at about page 14 and goes

18    to -- I forget -- about 20.  Exhibit 17 -- Specifically,

19    it's testimony about Exhibit 17.  And what Holmes Lilley,

10:48:19 20    the CEO of Chartwell, testified was, *All of this*

21    *information* -- this was in February and it concerned

22    information that Tony Alanis was authorized to access and

23    that Adam Kidan was authorized and entitled to receive.

24               THE COURT:  I saw that.  That's a red herring, as

10:48:35 25    far as I can tell.  Being authorized to access it doesn't --

*DEBORAH D. PARKER, U.S. COURT REPORTER*

10:48:39 1    when you find it in a file labeled "Empire" changes

2    everything.

3        MR. AFFELD:  Okay.  And Counsel misspoke.  These

4    were e-mails to Chartwell e-mail addresses.  Not to personal

10:48:53 5    addresses.  Some of them were from personal addresses

6    because people work from home, but they were sent to the

7    Chartwell address.  If the goal were to steal these files

8    and use them outside the company, what they would have done

9    is send them to a personal address and then Chartwell

10:49:08 10    wouldn't know that it happened.

11        The fact that it was sent to a Chartwell address

12    was precisely because it was being sent to Adam Kidan so he

13    could perform his job as a consultant to the company, per an

14    agreement with Holmes Lilley and also because as an owner,

10:49:21 15    he's entitled to know what the strength of the company is in

16    his marital dissolution proceeding where they need to put a

17    value on the company because he and his ex-wife are fighting

18    over the value and who gets what share of that.

19        So this is all information that he had absolutely

10:49:37 20    every right to.  And they left a clear paper trail when it

21    would have been easy to avoid doing so by sending it to

22    Chartwell's e-mail system, not to a personal e-mail system.

23        THE COURT:  All right.  Thank you.

24        MS. HUNTER:  One moment to correct the record,

10:49:52 25    Your Honor.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

10:49:54   1          THE COURT:  Very briefly.  And then, I'm going to

2     take the matter under submission.

3          MS. HUNTER:  Okay.  Thank you, Your Honor.

4          With respect to the contention that this was

10:50:02   5     somehow sent to Mr. Kidan's Chartwell e-mail address, that's

6     incorrect.  It was sent to a Yahoo! address.

7          When you print the document, it just says his

8     name, "Adam Kidan."  But as Mr. Holmes -- I'm sorry,

9     Mr. Lilley testified, they were all individual personal

10:50:20  10     e-mail addresses.  And if you'd like, we can submit a thumb

11     drive so you can put the mouse over e-mail address and see

12     it is a Yahoo! account.

13          But, regardless, I don't think it matters whether

14     it goes to his Chartwell e-mail address or to a personal

10:50:34  15     e-mail address, because you can see from Exhibit 22 to

16     Mr. Lilley's declaration, the e-mail that Mr. Kidan sent

17     when he resigned, he's demanding continued access to his

18     Chartwell e-mail account.  He does not say, *I'm leaving this

19     here for you to find.  I'm not taking anything.*

10:50:50  20          He says, *I instruct you to continue to give me

21     access to this e-mail account.*

22          That's all I have, Your Honor.

23          THE COURT:  All right.  The Court is going to take

24     it under submission.  The ruling will be posted on the

10:51:03  25     docket and should be posted either today or Monday.

10:51:08   1          MR. ROBINSON:  Your Honor, I just wanted to make

2     sure that -- there is a mandatory bonding requirement which

3     hasn't been addressed.

4          THE COURT:  Well, actually, the bond is in the

10:51:20   5     discretion of the Court.  However, that's on the defendant

6     to show what amount of bond is necessary, based on the

7     calculation of harm.  You didn't do that, so I'm not sure

8     how you think I'm going to impose a bond without that.  You

9     haven't done it.

10:51:42  10          Let me take a look here and see if I'm mistaken.

11    One moment.

12          (Pause.)

13          THE COURT:  Okay.  So, again, Rule 65(c) is what

14    is applicable here under Ninth Circuit law.  While it looks

10:53:33  15    mandatory, it's actually discretionary in that it's whatever

16    amount the Court believes is proper and that includes "if

17    any."  And it's defendant's burden to establish that a bond

18    is necessary.

19          And short of noting that the plaintiff didn't

10:53:49  20    address the bond requirement in its opening brief, the

21    defendants never give any statement as to what amount of a

22    bond would be appropriate other than saying -- Well, I

23    didn't see it.

24          So tell me if I missed it in your papers.

10:54:06  25          MR. ROBINSON:  So we did address in the further

21

10:54:10   1   opposition -- second set of opposition papers, and -- maybe

2   it was not --

3           THE COURT:  Just -- let's see.  The surreply?

4           MR. ROBINSON:  No.  We filed the initial

10:54:32   5   opposition papers on a Friday, I think.  And then, the

6   following Monday, we filed a full opposition.

7           THE COURT:  All right.  Yeah, the further

8   opposition.  Right.

9           Okay.  So point me where it is you addressed this.

10:54:45   10  I thought you just said they didn't say anything about a

11  bond and something like this would put us out of business,

12  or --

13          MR. ROBINSON:  That's essentially the argument,

14  Your Honor.

10:54:55   15          THE COURT:  Well, how do I calculate a bond?  I

16  mean, usually, I get -- if you want a bond, you give me some

17  specific information that provides me the basis upon which

18  to issue a bond.  If it's just --

19          And I'm not sure if it's the use of trade secrets

10:55:16   20  or solicitation of Chartwell's customers, whether any bond

21  is appropriate in that instance, but --

22          MR. ROBINSON:  To the extent that an order

23  prohibits Empire from contacting or doing business with any

24  Chartwell customer, I think we can safely say that would be

10:55:36   25  a massive detriment, if not completely devastating Empire's

10:55:42  1  business.

2           THE COURT:  Okay.

3           MR. ROBINSON:  So I'm happy to submit briefing or

4  evidence --

10:55:47  5           THE COURT:  That's what you were supposed to have

6  done.  I've given -- that's why this is on a regularly

7  notice motion.  It wasn't as if you didn't know about the

8  issue related to the bond.  You raised it and then you

9  didn't say anything that would allow the Court to make any

10:56:01 10  accurate determination of a bond.

11           So just saying that it's -- you know, it will put

12  us out of business, it's devastating -- I'm not sure which

13  of your declarations you used to support that, but nobody

14  gave any financial information that would provide any kind

10:56:22 15  of information.  So if you have something there, that I'm

16  missing, that's in the record --

17           MR. ROBINSON:  Your Honor, the -- we raised the

18  issue.  The plaintiff in their reply said they would post a

19  bond, if necessary.  And that's where it was left.  But we

10:56:40 20  still don't know what the scope of the relief they're

21  asking -- what scope of the relief they're asking for and

22  what Your Honor is going to grant.  They asked for a

23  preliminary injunction that says, *Don't use trade secrets.*

24  So if that's the scope of the preliminary injunction,

10:56:55 25  there's no clear indication of what that actually prohibits

10:56:58  1  us from doing.  And we don't want to be in a situation where

2  we're here on endless proceedings about whether I called

3  this customer and that was somehow a trade secret or

4  whatever the case may be.

10:57:09  5       So I think if we have a sense of the scope of

6  Your Honor's order, we can provide evidence of the direct

7  business impact.  But simply an order that Chartwell has

8  asked for saying *Don't use trade secrets*, how do we quantify

9  the impact on the business?  We're not --

10:57:26 10       No one at Empire is using trade secrets.

11       THE COURT:  All right.  Anything from the

12  plaintiff at this time?

13       MS. HUNTER:  Yes, Your Honor.

14       We have been very specific about what the trade

10:57:36 15  secrets are, which is the financial data and customer

16  information contained in both the MOS and the CRM databases,

17  which is exactly what Exhibit 17, 15 and 20 contain.  An

18  entire customer list is in Exhibit 15, which they downloaded

19  and has all of the aging account receivables for every

10:57:55 20  client that is the current Chartwell client.

21       THE COURT:  All right.  Anything further?

22       MR. ROBINSON:  The only thing -- the only thing

23  I'll add is that once we have an idea of the scope of the

24  relief that Your Honor seems inclined to grant, we'd like

10:58:12 25  the ability to put in evidence to show that specific relief

*DEBORAH D. PARKER, U.S. COURT REPORTER*

10:58:15  1   and the cost that it is going to incur to our client's

2   business from that.

3          THE COURT:  I'll take that consideration into

4   account, but -- that request into consideration, but the

10:58:31  5   papers have been filed.  It's not -- again, it's not a new

6   issue.  So, the Court is going to take the matter under

7   submission.  The ruling will be posted on the docket, likely

8   no later than Monday.

9          MR. ROBINSON:  Your Honor, if I may just add one

10:58:43  10  thing:  I want to be sure that our client is not prohibited

11  from talking to customers with whom they've already done

12  business and have done business for many years.

13         THE COURT:  I'm going -- I'm not even sure -- I'm

14  not sure what you're asking for.  I'll issue the order based

10:59:01  15  on the evidence that's in front of me saying, *Prohibited*

16  *from talking to clients that they have had many years*?

17         For many years that Chartwell has had, or that

18  they have independently -- they just started.  They haven't

19  had customers for many years.

10:59:17  20         MR. ROBINSON:  So they -- many of the customers

21  that have come to Empire are customers who were clients

22  before Chartwell -- clients of reps, before they left

23  Chartwell.  They came to Chartwell with those reps and then

24  they came to Empire.  So whether or not somebody had access

10:59:33  25  to a client list, their own customers who they have been

10:59:37  1   doing business with before Chartwell, actually --

2   THE COURT:  And you provided me with a list of who

3   these customers are that they did business with before

4   Chartwell and declarations of the same?  Evidence of the

10:59:51  5   same?

6   MR. ROBINSON:  Yes, Your Honor.

7   THE COURT:  Do you have any kind of chart or

8   anything that shows anything like that?

9   MR. ROBINSON:  We focused on the five that they

10:59:57 10   have identified.  Four of the five are -- four of the five

11   are customers from CRS who followed reps from CRS to

12   Chartwell.  The fifth one is a relationship that developed

13   from there, based on a personal contact at that customer.

14   And we have Mr. Kidan's declaration about the customers

11:00:19 15   following from CRS to Chartwell.

16   And we have Marlene Cornejo's declaration about

17   how she's had contact with the client rep, at Revolve, which

18   is the one outlier, since before she started at Chartwell.

19   THE COURT:  All right.

11:00:35 20   MS. HUNTER:  And, Your Honor, I think, if you look

21   at the declarations, that's accurate.  You'll see what was

22   provided and there is no --

23   *(Court Reporter requests clarification for the*

24   *record.)*

11:00:44 25   THE COURT:  And there is no evidence of the

11:00:45   1   preexisting relationship prior to Chartwell.

2          That's the statement.

3          MS. HUNTER:  Thank you.

4          THE COURT:  I'll take all of this under

11:00:52   5   submission.  I'll go back and make sure I've reviewed the

6   papers, and then the Court's ruling will be posted on the

7   docket.

8          Thank you.

9          THE CLERK:  All rise.

11:01:43  10       (At 11:01 a.m., proceedings were adjourned.)

11

12                 -oOo-

13

14                 CERTIFICATE

11:01:43  15        I hereby certify that pursuant to Section 753,

16   Title 28, United States Code, the foregoing is a true and

17   correct transcript of the stenographically reported

18   proceedings held in the above-entitled matter and that the

19   transcript page format is in conformance with the

11:01:43  20   regulations of the Judicial Conference of the United States.

21

22   Date:  May 23, 2019

23

24

11:01:43  25               /s/DEBORAH D. PARKER
               DEBORAH D. PARKER, OFFICIAL REPORTER